691 S.E.2d 813

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Dallas HUGHES, Defendant Below, Appellant.**

No. 34470.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 26, 2010.

Decided Feb. 11, 2010.

John J. Mize, Beckley, WV, for Appellant.

Kristen L. Keller, Prosecuting Attorney's Office, Beckley, WV, for Appellee.

DAVIS, Chief Justice:

Dallas Hughes (hereinafter referred to as "Mr. Hughes") appeals from a resentencing order of the Circuit Court of Raleigh County. The resentencing order imposed the following sentences on Mr. Hughes: life imprisonment with the possibility of parole for the crime of first degree murder by use of a firearm; five years imprisonment for the crime of wanton endangerment; one year incarceration for the crime of fleeing from the police; and six months incarceration for the crime of falsely reporting an emergency.[1] Here, Mr. Hughes contends that he is entitled to a new trial based upon the following errors: (1) the indictment did not charge him with felony murder, (2) the jury should not have been instructed on both felony murder and premeditated murder, (3) the trial court erred in not striking two jurors for cause, (4)

---

1. The sentences were structured so that the murder and wanton endangerment sentences ran consecutively to each other and consecutively to the sentences for fleeing from the police and falsely reporting an emergency. The latter two sentences ran concurrently to each other.

the jury improperly conducted deliberation in open court, (5) the trial court admitted evidence that Mr. Hughes possessed a handgun, (6) the trial court admitted evidence of a phone conversation between Mr. Hughes and a witness, and (7) the trial court admitted evidence of a voice message left on Mr. Hughes' cellular phone. After a careful review of the briefs, the record submitted on appeal and listening to the oral arguments, we affirm.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On June 12, 2004, at around 5:38 a.m., the Raleigh County Operations Center received a 911 emergency call indicating that a woman by the name of Sacha Mitchell had been shot in her home at the Beckley West Apartments in Beckley, West Virginia. The caller identified Mr. Hughes as a person seen leaving Ms. Mitchell's apartment at the time she was shot. It was later determined that Ms. Mitchell was shot once in the face and died at the scene of the crime.[2]

Based upon information provided during the 911 emergency call, the local police were able to locate Mr. Hughes driving through downtown Beckley in a blue Cadillac. Although at least three police cars followed Mr. Hughes with blue lights flashing and sirens on, he did not immediately stop. During the time that the police chased Mr. Hughes through the streets of downtown Beckley, he threw a bag out of his car. The bag was later retrieved by a police officer and was found to contain $9,600.00 in cash.

Mr. Hughes eventually stopped his vehicle. However, as several officers approached Mr. Hughes' car, he sped off at a high rate of speed. The police lost track of Mr. Hughes. Shortly after Mr. Hughes fled from the police, he abandoned his car and walked into the Beckley Police Department.[3] Mr. Hughes entered the police headquarters crying and complaining of being shot.

Although Mr. Hughes claimed that he had been shot, it was determined that he was not injured in any manner. While at police headquarters, Mr. Hughes was given Miranda warnings. After Mr. Hughes waived his Miranda rights, he voluntarily gave a statement to the police. In Mr. Hughes' statement, he gave three different versions of what happened at Ms. Mitchell's apartment.

In his initial statement to the police, Mr. Hughes indicated that he had been dating Ms. Mitchell but that the relationship ended. Mr. Hughes stated that he went to Ms. Mitchell's apartment around 3:00 a.m. on June 12, 2004. Mr. Hughes indicated that, during this initial visit, he did not enter Ms. Mitchell's apartment. Mr. Hughes stated that he and Ms. Mitchell argued outside of her apartment. Mr. Hughes stated further that he believed another man was in the apartment, but that he did not see him. After the argument ended, Mr. Hughes stated that Ms. Mitchell went into the apartment and tossed items out of her window that had belonged to Mr. Hughes. Mr. Hughes stated that he left the apartment, but returned because Ms. Mitchell had called him on his cellular phone. After Mr. Hughes returned to the apartment, he pushed the door open, but did not go inside the apartment. Mr. Hughes stated that he saw a man in the apartment and that the man had a gun. Mr. Hughes alleged that a "tussle" occurred and the man "almost shot him".[4] After the gun went off, Mr. Hughes left the apartment.

After Mr. Hughes gave his initial statement to the police, he was informed that Ms. Mitchell was dead and that neighbors saw him leaving her apartment shortly after a gun shot was heard. The police also told Mr. Hughes that the neighbors saw him throw an object in a wooded area near the apartment building. As a result of the information given by the police, Mr. Hughes changed his statement. Mr. Hughes stated that the man in Ms. Mitchell's apartment attacked him and pulled out a gun. Mr. Hughes stated further

---

2. Ms. Mitchell was nineteen years old at the time of her death. Ms. Mitchell had an infant child who was present in the home when she was killed. The infant was not injured.

3. Mr. Hughes' car was later found parked several blocks away from police headquarters.

4. It was unclear from Mr. Hughes' statement as to who was involved in the "tussle."

that Ms. Mitchell tried to grab the man. She fell, and the gun went off. Mr. Hughes indicated that he and the man left the building together.

After Mr. Hughes gave his second version of what happened at Ms. Mitchell's apartment, the police informed him several times that neighbors saw only him at the apartment. Mr. Hughes persisted in stating that another man was in the apartment. However, he eventually changed his story a third time and gave the following account of what happened:

> After the first argument she threw my clothes out the window. After the second argument I pushed her down to the stairs, and when she got back up she had the pistol in her hand—she had the pistol in her hand. And I got to laughing at her and got to playing ... I tried to smack it out of her hand and it wouldn't work so I grabbed her by the wrist and laid her down on the step and she tried to get up, I pushed her back down, I don't know if I was pushing her I just remember the gun going off, so I don't know what to do.

Subsequent to Mr. Hughes' third statement to the police, he was indicted on September 14, 2004, for first degree murder by use of a firearm, wanton endangerment, fleeing from the police, and falsely reporting an emergency. The guilt phase of the case was tried before a jury on January 4, 2005.[5] The jury returned a verdict on January 14, 2005, finding Mr. Hughes guilty of all charges. After the jury returned its verdict, the State and Mr. Hughes entered into an agreement. The agreement was approved by the trial court. Mr. Hughes would be sentenced to life with the possibility of parole on the murder conviction. In exchange for this agreement, the State would be permitted to seek a sentence of life imprisonment without the possibility of parole if Mr. Hughes appealed his conviction and was granted a new trial. Subsequent to this agreement, the trial court sentenced Mr. Hughes to life imprisonment

with the possibility of parole on the conviction for first degree murder by use of a firearm; five years imprisonment on the conviction for wanton endangerment; one year incarceration on the conviction for fleeing from the police; and six months incarceration on the conviction for falsely reporting an emergency.

Mr. Hughes filed posttrial motions, which included a motion for new trial, on April 8, 2005. The trial court denied the motions on August 11, 2006. For reasons that are not clear from the record, Mr. Hughes was resentenced for appeal purposes at least seven times. The last resentencing order was entered on November 12, 2008. Mr. Hughes now appeals from the last resentencing order.[6]

## II.

### STANDARD OF REVIEW

In this case, we are called upon to review assignments of error that have specific standards of review that will be set out under each assignment of error. As a general matter, however, we have held that in reviewing a trial court's denial of a posttrial motion for new trial,

> the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. pt. 4, in part, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). More specifically, we held in Syllabus point 3 of *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000), that,

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error

5. It appears that, during the trial, Mr. Hughes made an oral motion to bifurcate the issue of "mercy" on the first degree murder charge. The trial court granted the motion; therefore, the jury was not asked to determine whether mercy

should be given if they found Mr. Hughes guilty of first degree murder.

6. Other relevant facts in the case are discussed under the assignments of error.

under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

With these standards in view, we examine the issues presented in this appeal.

## III.

## DISCUSSION

### A. An Indictment Need Not Expressly Charge Felony Murder

■ As previously set forth, Mr. Hughes asserts several assignment of error. This opinion will consider each one separately. The first issue raised by Mr. Hughes concerns the State's prosecution of him for both premeditated murder and felony murder.[7] Mr. Hughes contends that the indictment returned against him did not expressly charge him with felony murder. Therefore, the State could not prosecute him for felony murder. We disagree.

As an initial matter, "we have recognized that *de novo* review is applied when the sufficiency of an indictment is questioned." *State v. Corra*, 223 W.Va. 573, 578, 678 S.E.2d 306, 311 (2009) (citation omitted). Further, "[a]n indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Syl. pt. 2, in part, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

This Court has held that our homicide statute, "W. Va.Code, 61–2–1, enumerates three broad categories of homicide constituting first degree murder: (1) murder by poison, lying in wait, imprisonment, starving; (2) by any wilful, deliberate and premeditated killing; (3) in the commission of, or attempt to commit, arson, rape, robbery or burglary." Syl. pt. 6, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978). The third category for first degree murder is the felony murder component. *See* Syl. pt. 3, *State ex*

rel. *Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977) ("*W. Va.Code*, 61–2–1 does not violate the due process clause of our federal and state constitutions. It requires the State to prove, in order to sustain a first degree murder conviction in a felony-murder case, that defendant committed or attempted to commit the named felony and that he committed murder incidental thereto.").

■ In the case of *State v. Bragg*, 160 W.Va. 455, 235 S.E.2d 466 (1977), this Court addressed the issue of whether an indictment for first degree murder had to set out a count alleging felony murder in order for the State to present evidence to sustain a felony murder conviction. In *Bragg*, "[t]he defendant was indicted for 'feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully' slaying Rebecca Sue Bricker." *Bragg*, 160 W.Va. at 463, 235 S.E.2d at 471. During the State's opening statement in *Bragg*, it announced that it would present evidence to support a felony murder conviction, with rape of the victim as the underlying crime to sustain the felony murder theory. The jury was ultimately instructed on felony murder and premeditated murder. The defendant was convicted of premeditated murder. On appeal, the defendant argued that it was error to instruct the jury on felony murder because the indictment did not charge such offense. This Court, in affirming the conviction, held the following in Syllabus point five of *Bragg*:

An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under W. Va.Code, 61–2–1, to set forth the manner or means by which the death of the deceased was caused.

160 W.Va. 455, 235 S.E.2d 466. *See also* W. Va.Code § 61–2–1 (1991) (Repl. Vol. 2005)

---

7. "Unlike traditional first degree murder, felony-murder does not require proof of the elements of malice, premeditation, or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission of, or the attempt to commit, one of the enumerated felonies." *State v. Lanham*, 219 W.Va. 710, 715, 639 S.E.2d 802, 807 (2006) (internal quotations and citation omitted).

("In an indictment for murder ..., it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.").

The holding in *Bragg* was applied in *State v. Satterfield,* 193 W.Va. 503, 457 S.E.2d 440 (1995). Justice McHugh, writing for the Court in *Satterfield,* addressed the *Bragg* felony murder issue as follows:

> According to the appellant, the indictment charged him with "feloniously, maliciously, deliberately and unlawfully ... slay[ing], kill[ing], and murder[ing] one Billy Harper[.]" The appellant argues that since the indictment did not reflect that the murder occurred during a robbery, it was error for the trial judge to read instructions regarding felony murder. However, this argument has been rejected previously by this Court in [*Bragg,*] a case in which the defendant was convicted under the theory of felony murder.
>
> ... Thus, it is clear that the indictment did not need to specifically charge the appellant with felony murder. Additionally, it follows that it was not error for the trial judge to read instructions regarding felony murder.

*Satterfield,* 193 W.Va. at 513, 457 S.E.2d at 450. *See State v. Justice,* 191 W.Va. 261, 445 S.E.2d 202 (1994) (holding that State could present felony murder theory even though indictment did not specifically charge felony murder); *State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (1983) (same).

■ In the instant proceeding, the indictment charged only that Mr. Hughes "did unlawfully, feloniously, maliciously, willfully, deliberately and with premeditation slay, kill and murder one Sacha Mitchell." During the State's opening statement, it indicated that, in addition to a premeditated murder theory, the case would also be prosecuted on a felony murder theory with burglary being the underlying felony. Although Mr. Hughes now contends that he was unfairly surprised by the felony murder theory because it was not set out in the indictment, our precedents clearly permitted the State to proceed on a felony murder theory. Moreover, we do not see how Mr. Hughes was unfairly surprised because the content of his statement to the police and other evidence clearly should have put him on notice of underlying felony conduct.[8] We therefore reject this assignment of error. *See Humphrey v. Ballard,* No. 2:08–CV–00879, 2009 WL 2762331, at \*6 (S.D.W.Va. Aug. 25, 2009) ("In West Virginia, it is a well settled point of law, now codified from long standing precedent, that an indictment need not specify the State's theory of prosecution. That includes both the specific degree of murder and the felony murder theory.... No federal precedent has held this to be a violation of due process.").

### B. The Trial Court Could Instruct the Jury on Both Felony Murder and Premeditated Murder

■ The next issue raised by Mr. Hughes is that the jury should not have been allowed to consider both a felony murder charge and a premeditated murder charge. The record indicates that, at the close of the evidence, Mr. Hughes made a motion to have the State make an election between premeditated murder and felony murder.[9] The trial court denied the motion. We have held that "[t]he granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discre-

8. Mr. Hughes did not argue in his brief that the evidence was insufficient to establish the underlying burglary felony.

9. Mr. Hughes argued in his brief that he also made a motion during trial asking the court not to allow the State to present evidence of both premeditated murder and felony murder. The State correctly points out that Mr. Hughes did not seek to have an election between the theories until *after* the close of the evidence. Prior to that time, Mr. Hughes sought several mistrials because of the State's use of both theories. We should note that, for the reasons set out in the body of this opinion, even if Mr. Hughes had made such a motion before the close of the evidence, it would not have been error to deny such motion.

tion." Syl. pt. 3, *State v. Walker,* 188 W.Va. 661, 425 S.E.2d 616 (1992).

■ The issue of election between premeditated murder and felony murder was squarely addressed by this Court in *Stuckey v. Trent,* 202 W.Va. 498, 505 S.E.2d 417 (1998). The decision in *Stuckey* was an appeal by the defendant from a trial court's order denying him habeas corpus relief. The defendant in the case was convicted in 1989 of seven counts of murder in the first degree. The defendant received seven consecutive life sentences for the murders. In the habeas proceeding, this Court granted an appeal "upon the limited issue of whether the trial court in the underlying case committed error in not requiring the State to elect, upon the [defendant's] objection, either: (1) a willful, deliberate and premeditated murder theory or (2) a felony-murder theory, in pursuing the convictions." *Stuckey,* 202 W.Va. at 500, 505 S.E.2d at 419. The defendant contended in the habeas appeal "that the State's failure to elect rendered the trial unfair and constituted a denial of his right to due process of law." *Stuckey,* 202 W.Va. at 500, 505 S.E.2d at 419. Justice Workman, writing for the Court, rejected the contention. In doing so, the following principle of law was set out in Syllabus point 5 of *Stuckey:*

> In West Virginia, (1) murder by any willful, deliberate and premeditated killing, and (2) felony-murder constitute alternative means under W. Va.Code, 61–2–1 [1991], of committing the statutory offense of murder of the first degree; consequently, the State's reliance upon both theories at a trial for murder of the first degree does not, per se, offend the principles of due process, provided that the two theories are distinguished for the jury through court instructions; nor does the absence of a jury verdict form distinguishing the two theories violate due process, where the State does not proceed against the defendant upon the underlying felony.

202 W.Va. 498, 505 S.E.2d 417.

■ Under the decision in *Stuckey,* the State may seek a conviction for felony murder and premeditated murder so long as the trial court instructs the jury on the distinction between the two theories. Further,

*Stuckey* does not require a verdict form to make a distinction between the two theories so long as the State does not seek a conviction for the felony underlying the felony murder theory. *See* Syl. pt. 9, *State v. Giles,* 183 W.Va. 237, 395 S.E.2d 481 (1990) ("In a prosecution for first-degree murder, the State must submit jury instructions which distinguish between the two categories of first-degree murder—willful, deliberate, and premeditated killing and felony-murder—if, under the facts of the particular case, the jury can find the defendant guilty of either category of first degree murder. When the State also proceeds against the defendant on the underlying felony, the verdict forms provided to the jury should also reflect the foregoing distinction so that, if a guilty verdict is returned, the theory of the case upon which the jury relied will be apparent.").

In the instant proceeding, the trial court relied upon *Stuckey* in denying Mr. Hughes' motion to have the State elect between felony murder and premeditated murder. The record demonstrates that the trial court properly instructed the jury regarding the distinction between felony murder and premeditated murder. Further, the verdict form in the instant case did not make a distinction between felony murder and premeditated murder because the State did not seek a conviction for the underlying burglary felony. In view of these facts, we find no abuse of discretion by the trial court in denying Mr. Hughes' motion.

### C. Refusal to Strike Two Jurors for Cause

■ The next issue raised by Mr. Hughes is that the trial court erred in not striking two jurors for cause. The two jurors at issue were Amy Diehl and Dorothy Alpaugh. Both women served on the jury during the trial of the case. Our standard of review in determining whether a trial court committed error in refusing a defendant's motion to strike potential jurors for cause has been stated as follows:

> In reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory

qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court.

*State v. Miller,* 197 W.Va. 588, 600–01, 476 S.E.2d 535, 547–48 (1996). Further, this Court set out the following additional review guidelines in Syllabus points 4, 5, and 6 of *Miller:*

4. The relevant test for determining whether a juror is biased is whether the juror had such a fixed opinion that he or she could not judge impartially the guilt of the defendant. Even though a juror swears that he or she could set aside any opinion he or she might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if the other facts in the record indicate to the contrary.

5. Actual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed.

6. The challenging party bears the burden of persuading the trial court that the juror is partial and subject to being excused for caused. An appellate court only should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias only when it is left with a clear and definite impression that a prospective juror would be unable faithfully and impartially to apply the law.

*Id.*

▆▆▆ **1. Refusal to strike Amy Diehl.** Mr. Hughes contends that the trial court should have struck Ms. Diehl for cause on the grounds that Ms. Diehl stated that, when someone is charged with an offense, he/she is more likely than not guilty. Mr. Hughes relies primarily upon the majority per curiam opinion in *State v. Griffin,* 211 W.Va. 508, 566 S.E.2d 645 (2002), to support his position that Ms. Diehl should have been struck for cause based upon this response.

The defendant in *Griffin* was convicted of attempted burglary. On appeal, the defendant argued that the trial court erred in not striking a juror for cause based upon the following exchange:

THE COURT: Do you believe that when somebody has been indicted, they are most likely to be guilty than not, based on your experience when you were with grand juries?

JUROR YOUNG: Probably.

*Griffin,* 211 W.Va. at 511, 566 S.E.2d at 648. As a result of this narrow exchange between the trial court and the juror, the majority in *Griffin* determined that the juror should have been struck for cause. However, in the dissenting opinion in *Griffin* written by Chief Justice Davis, in which Justice Maynard joined, the dissent stated:

The majority opinion also focused upon Ms. Young's response to the judge's questioning indicating that she "probably" believed that "when somebody has been indicted, they are more likely to be guilty than not." This statement, taken out of context in the majority opinion, was not an indication of prejudice against Mr. Griffin. I believe Ms. Young's response was an honest response of the type one would expect from the average person. That is, I do not believe that the average person in the state of West Virginia believes that the majority of people who are indicted are innocent. Our criminal justice system would indeed be flawed if most people who are indicted are innocent.

Moreover, this specific issue is not new to this Court. We have previously addressed the issue in *State v. Williams,* 206 W.Va. 300, 524 S.E.2d 655 (1999) (per curiam). In *Williams,* the defendant argued that the trial court committed error in refusing to strike a juror who "indicated that he believed when a person is indicted that person is guilty of the offense." *Williams,* 206 W.Va. at 303, 524 S.E.2d at 658. This Court rejected the defendant's argument after concluding that, based upon the full questioning by the trial court, the juror "truly understood that an indictment was nothing more than an accusatory instrument and not evidence of guilt."

*Williams,* 206 W.Va. at 304, 524 S.E.2d at 659.

Similarly, in [*State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535 (1996) ], the defendant was convicted of first degree murder. One of the issues argued on appeal was that a juror, who actually served on the jury that convicted the defendant, should have been struck for cause on the ground that the juror indicated she " 'believed a person could not be charged without being guilty.' " *Id.,* 197 W.Va. at 604, 476 S.E.2d at 551. In writing for the Court, Justice Cleckley summarily rejected the argument. The opinion concluded that "the prospective juror expressed the opinion that if she believed someone was not guilty she would have no problem returning a not guilty verdict." *Id.*

*Griffin,* 211 W.Va. at 513–14, 566 S.E.2d at 650–51 (Davis, C.J., dissenting). The dissenters in *Griffin* articulated the correct standard for evaluating a statement like the one Ms. Diehl made in response to the question. That is, the focus is not exclusively upon a response that potentially reveals bias; the response to the question must be viewed in light of additional answers to follow-up questions. *See State v. Newcomb,* 223 W.Va. 843, 859–60, 679 S.E.2d 675, 691–92 (2009) ("[W]hen a juror makes an inconclusive or vague statement that only indicates the possibility of bias or prejudice, the prospective juror must be questioned further by the trial court and/or counsel to determine if actual bias or prejudice exists.... Thereafter, the totality of the circumstances must be considered, and where there is a probability of bias the prospective juror must be removed from the panel by the trial court for cause.").

In *Ladd v. State,* 3 S.W.3d 547 (Tex.Crim. App.1999), a juror made a statement similar to that in *Griffin* and the instant case. The defendant in *Ladd* was convicted of capital murder and was sentenced to death. One of the issues raised on appeal was that the trial court committed error in failing to strike a juror for cause. The issue was stated by the appellate court in *Ladd* as follows:

The record reflects that, upon questioning by defense counsel, [the juror] stated that he "leaned" in the direction of believing appellant guilty simply because appellant had been arrested and indicted. The record also reflects, however, that, upon questioning by the State and by the trial court, [the juror] stated repeatedly that he could follow the law, hold the State to its burden of proof, and presume the defendant innocent.

*Ladd,* 3 S.W.3d at 560. As a result of the juror's responses to follow-up questioning, the appellate court in *Ladd* held that "[w]e discern no abuse of discretion in the trial court's denial of appellant's challenge of [the juror]. On the record before us, the trial court could have reasonably concluded that [the juror] would follow the law and afford appellant the presumption of innocence." *Ladd,* 3 S.W.3d at 560. *See Pressley v. State,* 770 So.2d 115, 126–27 (Ala.Crim.App. 1999) ("[The juror] agreed with the proposition that because [defendant] had been charged with a crime, he was 'probably' guilty. However, [the juror] also said that he felt he could listen to the evidence and base a verdict on the evidence he heard in the courtroom.... He told the trial court that he would follow the law as it was given to him by the court.... The trial court did not abuse its discretion in declining to grant [defendant's] challenge for cause[.]"); *Raulerson v. State,* 268 Ga. 623, 491 S.E.2d 791, 799 (1997) ("The venireperson had opined that [defendant] was 'probably' guilty of the crimes because he was arrested and charged; however, he subsequently stated that he could lay this bias aside and afford [defendant] the presumption of innocence. The trial court did not manifestly abuse its discretion by concluding that the venireperson was not prejudiced."); *Commonwealth v. Sweeney,* 464 Pa. 425, 347 A.2d 286, 288 (1975) ("Appellant had asked each of the challenged jurors whether they believed that it was more likely than not that, because the defendant had been arrested and held for trial, he must be guilty of something.... Each challenged juror answered in the affirmative. Each of these jurors, however, also indicated upon further questioning by the trial judge, that they could follow instructions not to draw any inference from the facts of defendant's arrest and trial. All of the challenged jurors indicated that they would ren-

der their verdict solely on the basis of the evidence presented."); *Cressell v. Commonwealth*, 32 Va.App. 744, 531 S.E.2d 1, 10 (2000) ("[A]lthough [the juror] initially expressed her belief that [defendant] was 'probably guilty of something because why would he be here,' ... she ... expressed no equivocation in her ability to follow the court's instructions and in her ability to apply the facts to the law.... Accordingly, we find that the trial court did not err in refusing to strike [the juror] for cause.").

The per curiam majority opinion in *Griffin* is an anomaly that can only cause confusion in our voir dire jurisprudence. Consequently, we make clear today, and so hold, that a prospective juror is not subject to removal for cause merely because he/she affirmatively answered a question which, in essence, asked whether the juror believes that a person is arrested or charged because there is probable cause that the person is guilty. To the extent that *State v. Griffin*, 211 W.Va. 508, 566 S.E.2d 645 (2002), holds otherwise, it is overruled.

In the instant proceeding, during voir dire of Ms. Diehl the following exchange occurred:

DEFENSE COUNSEL: Do you believe that, when someone is charged, they're more likely than not to be guilty?

JUROR DIEHL: Yes.

DEFENSE COUNSEL: You do believe that?

JUROR DIEHL: Yes, I believe that.

DEFENSE COUNSEL: No further questions.

. . . .

PROSECUTOR: Let me follow up on that. Ma'am, are you aware that, before somebody is arrested, a warrant has to issue for their arrest?

JUROR DIEHL: Yes.

PROSECUTOR: And you're aware that, before a warrant issues, that a magistrate makes a finding of what's called probable cause?

JUROR DIEHL: Right.

PROSECUTOR: And is that why you answered as you did because—

JUROR DIEHL: Yes.

PROSECUTOR: Thank you. That's all I have.

THE COURT: Anything else, Mr. Wooton (defense counsel)?

DEFENSE COUNSEL: No, Your Honor.

After the above exchange, Mr. Hughes moved the trial court to strike Ms. Diehl for cause based upon the majority decision in *Griffin*.[10] The trial court denied the motion. We find no abuse of discretion in the trial court's ruling. It is clear to this Court that Ms. Diehl did not articulate a bias or prejudice against Mr. Hughes. Ms. Diehl simply stated a widely known fact that some evidence must be shown to infer a person's involvement in a crime, *i.e.*, probable cause, before he/she is arrested.[11]

---

**10.** In his brief, Mr. Hughes also cited to the decision in *State v. Bennett*, 181 W.Va. 269, 382 S.E.2d 322 (1989). According to Mr. Hughes, the decision in *Bennett* stands for the proposition that a juror must be struck for cause if he/she indicates that a person charged with a crime is more likely than not guilty. *Bennett* does not stand for such a proposition, nor was the case resolved on that ground. This Court found that two jurors should have been struck for cause in *Bennett* because (1) one juror indicated he was reluctant to be on the jury and that it would be difficult to put aside his prejudices against the defendant and (2) the second juror was related by marriage to the prosecuting attorney who was prosecuting the case against the defendant.

**11.** We also reject Mr. Hughes' contention that Ms. Diehl was improperly rehabilitated in violation of Syllabus point 5 of *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002). In Syllabus

point 5 of *O'Dell* we held that "[o]nce a prospective juror has made a clear statement during voir dire reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair." *Id.* We reject Mr. Hughes' reliance on Syllabus point 5 of *O'Dell* because the follow-up questioning did not constitute rehabilitation. The follow-up questioning was consistent with Syllabus point 4 of *O'Dell* where we held that "[i]f a prospective juror makes an inconclusive or vague statement during voir dire reflecting or indicating the possibility of a disqualifying bias or prejudice, further probing into the facts and background related to such bias or prejudice is required." 211 W.Va. 285, 565 S.E.2d 407. In this proceeding, counsel for Mr. Hughes asked Ms. Diehl a question that elicited a response that suggested a potential bias. The State was permitted to ask

■ **2. Refusal to strike Dorothy Alpaugh.** In his brief, Mr. Hughes argues that the trial court should have struck Dorothy Alpaugh for cause as a result of a statement she made suggesting that a person charged with a crime is probably guilty.[12] The State correctly points out that Mr. Hughes did not seek to have Ms. Alpaugh struck because of the aforementioned statement. The record in this case indicates that Mr. Hughes sought to have Ms. Alpaugh removed for cause on the grounds that she knew a potential witness that was going to be called by the State.[13] Insofar as Mr. Hughes has attempted to assert, for the first time on appeal, a ground for striking Ms. Alpaugh that was not asserted below, we decline to address the new basis for striking her.[14] "Our law is clear in holding that, as a general rule, we will not pass upon an issue raised for the first time on appeal." *Mayhew v. Mayhew*, 205 W.Va. 490, 506, 519 S.E.2d 188, 204 (1999). *See State v. DeGraw*, 196 W.Va. 261, 272, 470 S.E.2d 215, 226 (1996) ("We agree with the State's contention that the Appellant's claim of error under Rule 404(b) is precluded from appellate review based on his failure to state this authority as ground for his objection before the trial court."); Syl. pt. 17, in part, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974) ("[E]rrors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there.").

### D. Allowing Jury to Rehear Tape Recordings in Open Court after Deliberations Began

■ The next issue raised by Mr. Hughes is that the jury was improperly required to conduct deliberations in open court. The State contends that the jury did not conduct deliberations in open court. Instead, the State points out that after the jury retired to deliberate, the jury made a request to listen to two tape recordings that, were admitted into evidence during the trial. To accommodate the jury, the trial judge brought the jury back into the courtroom to listen to the tapes.

■ The method by which a trial court responds to a request by a jury after it has begun deliberations "is a matter of sound discretion of the trial court, and its exercise of this discretionary power will not be cause for reversal except in case of the abuse of the discretion[.]" *State v. Sandler*, 175 W.Va. 572, 575, 336 S.E.2d 535, 538 (1985). We have held that "[t]he proper method of responding to a written jury inquiry during the deliberations period in a criminal case . . . is for the judge to reconvene the jury and to give further instructions, if necessary, in the presence of the defendant and counsel in the courtroom." Syl. pt. 3, *State v. Allen*, 193

---

follow-up questions to determine whether an actual bias existed.

**12.** The following relevant exchange took place between Ms. Alpaugh and defense counsel:

> DEFENSE COUNSEL: Let me ask you this. The fact that someone was charged with killing, would you be inclined to believe that he's probably guilty if he was charged?
> JUROR ALPAUGH: Well, I wouldn't say necessarily guilty. There's probable cause, I would say or he wouldn't be charged.
> DEFENSE COUNSEL: So you think there would have been at least probable cause or he wouldn't be charged?
> JUROR ALPAUGH: Sure.
> DEFENSE COUNSEL: But not necessarily guilty?
> JUROR ALPAUGH: Right.
> DEFENSE COUNSEL: But probably guilty?
> JUROR ALPAUGH: Well, yeah, I would think so. If they didn't have any evidence, they wouldn't charge you at all; would they?
> . . . .

DEFENSE COUNSEL: That's all I have. That's my only question about it.

**13.** It should be noted that the State, out of an abundance of caution, informed the trial court that the State would not call the witness who Ms. Alpaugh knew. As a result of the State agreeing not to call the witness, and because the trial court did not believe that Ms. Alpaugh was biased, the court denied Mr. Hughes' motion to strike her for cause. Ms. Alpaugh went on to serve on the jury that convicted Mr. Hughes.

**14.** During oral arguments, appellate counsel for Mr. Hughes argued that trial counsel made a hybrid objection to Ms. Alpaugh that included striking her as a result of the statement. However, our review of the transcript did not reveal this alleged hybrid objection.

W.Va. 172, 455 S.E.2d 541(1994). *See* Syl. pt. 1, *Klesser v. Stone,* 157 W.Va. 332, 201 S.E.2d 269 (1973) ("As a general rule, all communications between the trial judge and the jury, after the submission of the case, must take place in open court and in the presence of, or after notice to, the parties or their counsel.").

This Court has never addressed the issue of whether a trial court may bring a deliberating jury back into the courtroom to listen to tape-recorded evidence that was admitted during the trial. We have, however, addressed the issue of allowing a jury, during deliberations in the jury room, to review a tape recording admitted into evidence. We confronted this issue in *State v. Dietz,* 182 W.Va. 544, 390 S.E.2d 15 (1990).

In *Dietz,* the defendant was convicted of first degree murder. One of the issues raised by the defendant on appeal was that the trial court committed error in allowing the jury, during deliberations, to listen to a tape recording of his confession. This Court reviewed the law of other jurisdictions and found that federal courts and many state courts permitted jurors to listen to tape recordings, admitted into evidence, while deliberating. Consequently, we held in *Dietz* that

> we join these jurisdictions in holding that in a criminal case it is not reversible error for a trial court to allow a ... tape recording, which contains a confession or incriminating statement, and which has already been admitted into evidence, to be taken into the jury room for the jury's use during deliberations.

*Dietz,* 182 W.Va. at 558, 390 S.E.2d at 29.

*Dietz* was not concerned with whether the tape recording could be replayed in open court for the jury. The decision was narrowly confined to the question of allowing the tape recording to be taken into the jury

room. We find no justification for limiting *Dietz* to allowing jurors to review a tape recording only in the jury room.[15] In fact, allowing the jury to listen to such a recording in open court "minimizes the risk of breakage or erasure of the recording and, more importantly, allows a circuit court to guide the jury, with the assistance of all counsel, so that no part of the recording is overemphasized relative to the testimony given from the witness stand." *State v. Anderson,* 291 Wis.2d 673, 717 N.W.2d 74, 84 (2006). In our review of other jurisdictions, we find that it appears to be universally accepted that a trial court may allow a jury, while deliberating, to return to open court to review a tape recording that was admitted into evidence. *See United States v. Thabateh,* 40 Fed.Appx. 392, 395 (9th Cir.2002) ("Where, as here, the district court instructs the jury that the tape recording is the evidence, and not the transcript, there was no error in permitting the jury to read along in the transcript as the tape was replayed in open court during the deliberations."); *State v. Blankinship,* 127 Ariz. 507, 622 P.2d 66, 70 (Ariz.Ct.App.1980) ("Since the jury requested the repeated playings of the taped confession, the court acted within its discretion in allowing the tape to be played in open court[.]"); *State v. Gould,* 241 Conn. 1, 695 A.2d 1022, 1031 (1997) ("Where a court decides, pursuant to that court's sound discretion, that the jury should be permitted to replay videotaped deposition testimony, it must be done in open court under the supervision of the trial judge and in the presence of the parties and their counsel."); *Bridges v. State,* 279 Ga. 351, 613 S.E.2d 621, 625 (2005) ("[T]he accepted practice is to bring the jury back into open court to rehear recorded evidence during deliberations[.]"); *Linger v. State,* 508 N.E.2d 56, 61 (Ind.Ct.App.1987) ("[Our law] required the judge, on the jury's request, to replay the

---

**15.** In the context of a civil trial, this Court has held that "[w]hether a jury, after retirement, may, upon their request, have a particular portion of the evidence read to them, is ordinarily a matter resting in the sound discretion of the trial court. The exercise of that discretion is reviewable on appeal." Syl. pt. 3, *Nixon v. Shaver,* 115 W.Va. 469, 176 S.E. 849 (1934). The holding in *Nixon* was applied in a criminal case by the Virginia Court of Appeals. *See Kennedy v. Com-*

*monwealth,* 18 Va.App. 543, 445 S.E.2d 699, 702 (1994). *See also* Franklin D. Cleckley, Vol. 2, *Handbook on West Virginia Criminal Procedure,* at II–262 (1993) ("During deliberations, it is not uncommon for jurors to request that certain testimony be read to them to refresh their memory. Clearly, the West Virginia and the majority view is that it is discretionary with the trial judge to permit a particular portion of evidence to be read to the jury.").

properly admitted audio tape in open court."); *State v. Kraus*, 271 Kan. 810, 26 P.3d 636, 642 (2001) ("The trial court did not abuse its discretion in allowing the jury to listen to the audio portion of the CD–ROM during deliberations in the courtroom[.]"); *State v. Bohanon*, No. A03–1528, 2004 WL 2093998, at *3 (Minn.Ct.App. Sept. 21, 2004) ("[I]t is 'preferable,' if the jury seeks to review a tape, which, although received into evidence requires equipment to review, for the court to have the jury brought back into the courtroom for that purpose."); *State v. Anthony*, 837 S.W.2d 941, 945 (Mo.Ct.App. 1992) ("[A]llowing the jury to hear the tape during deliberations was not an abuse of discretion. The tape had been played in open court."); *State v. Bao*, 263 Neb. 439, 640 N.W.2d 405, 415 (2002) ("When a jury makes a request to rehear certain evidence … [i]f, after th[e] careful exercise of discretion, the court decides to allow some repetition of the evidence, it can do so in open court in the presence of the parties or their counsel or under strictly controlled procedures of which the parties have been notified."); *State v. Michaels*, 264 N.J.Super. 579, 625 A.2d 489, 524 (N.J.Super.Ct.App.Div.1993) ("[W]e refuse to hold that it is never permissible, at a jury's request during deliberations, to replay a videotape of testimony in its entirety for the jury, with the defendant present, in open court."); *Bradley v. State*, 561 P.2d 548, 553 (Okla. Crim.App.1977) ("[T]he trial court [did not commit error] when it permitted the jury, after deliberation had begun, to return to the courtroom to listen to a tape recording of a witness."); *State v. Jenkins*, 845 S.W.2d 787, 793 (Tenn.Crim.App.1992) ("[T]he replaying of the recording of Mr. Kirby's testimony was the most accurate method available to comply with the jury's request. The trial court gave notice to the prosecutor and defense counsel regarding the request and the recording was played in open court."); *State v. Morgensen*, 148 Wash.App. 81, 197 P.3d 715, 719 (2008) ("[B]efore playing the audiotape of the testimony in open court [to the deliberating jury], the trial court cautioned the parties not to make expressions of any kind during the playing of the tape."). Therefore, we now hold that if a jury, during its deliberation, asks a trial court to permit it to listen to a tape recording that was admitted into evidence, the trial court has discretion to bring the jury back into the courtroom to listen to the tape recording.

In the instant matter, the record indicates that the jury wanted to listen to two tape recordings that had been played during the trial. However, the tape recordings contained information that the jury was not permitted to hear. That is, when the tapes were played during the trial, the volume was turned down for parts of the recordings that the jury was not permitted to hear. As a result of the tapes containing both admitted evidence and excluded evidence, the trial court suggested that the jury be required to listen to the tapes in open court so that the jury would not be able to hear evidence that was excluded. It was also suggested by a court officer that the tapes could be recorded again, with the excluded statements edited, thereby allowing the jury to listen to them in the jury room. After this alternative method was suggested, the trial court asked Mr. Hughes' counsel if he preferred to have the jury listen to redacted tapes. Mr. Hughes' counsel stated that he did not object to having the jury brought into the courtroom to listen to the tapes in the same manner as was done during the trial.

The general rule followed by this Court is that a criminal conviction will not be reversed for any error in the record introduced by or invited by the defendant. *See State v. Corra*, 223 W.Va. 573, 582 n. 10, 678 S.E.2d 306, 315 n. 10 (2009). Further, we have held that:

> "Invited error" is a cardinal rule of appellate review applied to a wide range of conduct. It is a branch of the doctrine of waiver which prevents a party from inducing an inappropriate or erroneous response and then later seeking to profit from that error. The idea of invited error is … to protect principles underlying notions of judicial economy and integrity by allocating appropriate responsibility for the inducement of error. Having induced an error, a party in a normal case may not at a later stage of the trial use the error to set aside its immediate and adverse consequences.

*State v. Crabtree,* 198 W.Va. 620, 627, 482 S.E.2d 605, 612 (1996). Under our prior holdings on this issue, it was not error for the trial court to bring the jury back into the courtroom to listen to the tapes. However, even if we had found this to be error under the facts of this case, Mr. Hughes invited such error and cannot now complain on appeal.

### E. Admission of Evidence

Mr. Hughes further contends that the trial court committed error in admitting (1) evidence that Mr. Hughes possessed a handgun, (2) evidence of a phone conversation between Mr. Hughes and a witness, and (3) evidence of a voice message left on Mr. Hughes' cellular phone. This Court has previously held that, as a general rule, "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. pt. 4, *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998). In our review of the evidentiary issues raised by Mr. Hughes, we find no abuse of discretion.

**1. Admission of evidence that Mr. Hughes possessed a handgun.** Mr. Hughes contends that the trial court erroneously allowed witnesses to testify that he owned or possessed a handgun, other than that which killed Ms. Mitchell. To support his contention that such evidence was inadmissible, Mr. Hughes relies upon our decision in *State v. Walker,* 188 W.Va. 661, 425 S.E.2d 616 (1992).

In *Walker,* this Court reversed a murder conviction and remanded the case for a new trial. In doing so, this Court made clear that, "[a]lthough standing alone the errors defendant assigns might be harmless, the cumulative effect of numerous errors hopelessly tainted the first trial." *Walker,* 188 W.Va. at 664, 425 S.E.2d at 619. One of the "standing alone harmless errors" that this Court found in *Walker* involved the State's introduction of "evidence about a .357 Magnum revolver, brass cartridge cases, ammunition, and other firearm accessories that were found in [the defendant's] house at the time

of his arrest." *Walker,* 188 W.Va. at 668, 425 S.E.2d at 623. We found this evidence to be irrelevant and therefore inadmissible because it did not relate to any issue in the case. *Walker* is distinguishable from the facts of the instant case.

In the instant proceeding, the evidence at trial showed that Ms. Mitchell was killed with a silver-colored .38 caliber revolver, that had a black-rubberized handle. Mr. Hughes put on a defense that suggested that Ms. Mitchell owned or possessed the gun that killed her. Mr. Hughes called one witness who testified to having previously seen Ms. Mitchell playing with a gun. The State sought to prove that Ms. Mitchell never owned or possessed a gun, and that the gun that killed her was owned or possessed by Mr. Hughes. To do this, the State called several witnesses who testified that Ms. Mitchell never owned or possessed a gun, but that they had seen Mr. Hughes with a handgun in the past. Specifically, two of the State's witnesses testified simply that they had seen Mr. Hughes with a handgun. Another witness testified that Mr. Hughes once possessed a black handgun. Finally, Tijuana Mitchell, the victim's mother, testified for the State that she had seen Mr. Mitchell with a black gun and a silver gun.

In view of Mr. Hughes' contention at trial that Ms. Mitchell owned or possessed the gun that killed her, we find that the State's evidence of Mr. Hughes' possession of handguns was relevant and admissible. Therefore, the trial court did not abuse its discretion in admitting such evidence.

**2. Admission of evidence of a phone conversation between Mr. Hughes and a witness.** Mr. Hughes argues that it was error for the trial court to admit a tape-recorded telephone conversation that he had with a woman named Takiyah Bly. Mr. Hughes was in jail awaiting prosecution when he spoke with Ms. Bly on the telephone.[16] For the reasons set out below, we decline to address the issue on its merits.

Ms. Bly was initially listed as a witness for Mr. Hughes, but the State subsequently also

---

16. The telephone conversation was recorded by South Regional Jail officials. Mr. Hughes has

not argued that recording the telephone conversation was improper.

listed her as its witness. The State was going to call Ms. Bly to testify that Mr. Hughes visited her shortly before Ms. Mitchell was killed and shortly after Ms. Mitchell was killed. Prior to her testimony, Ms. Bly informed the State that Mr. Hughes called her [17] and tried to have her testify that he did not visit her after Ms. Mitchell was killed.[18] Upon learning of the telephone call, the State obtained a copy of the recorded conversation from jail authorities.

All the parties met with the trial judge for a hearing to determine whether the taped telephone conversation would be admitted into evidence. Ultimately, the State decided not to admit the taped telephone conversation into evidence. The State decided to have Ms. Bly testify about the nature of the telephone conversation. However, counsel for Mr. Hughes objected to not having the taped telephone conversation introduced to the jury and took the following position:

> DEFENSE COUNSEL: We think that the tape has to be played if she's going to come in here and testify. We don't think it shows what the State is portraying.
>
> THE COURT: Right, right.

Assuming, for the sake of argument, that the taped telephone conversation with Ms. Bly should not have been introduced into evidence, Mr. Hughes cannot now complain about that matter. He invited the error. This Court has made clear that "[a] judgment will not be reversed for any error in the record introduced by or invited by the party seeking reversal." Syl. pt. 4, *State v. Mann*, 205 W.Va. 303, 518 S.E.2d 60 (1999). *Accord Hatfield v. Painter*, 222 W.Va. 622, 633, 671 S.E.2d 453, 464 (2008) ("In summary, because the error, if any, was created by the defendant ..., he has waived any claims he had regarding such error."); Syl. pt. 2, *State v. Bowman*, 155 W.Va. 562, 184 S.E.2d 314 (1971) ("An appellant ... will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case.").

**3. Admission of evidence of voice message left on Mr. Hughes' cellular phone.** The last issue raised by Mr. Hughes is that the trial court committed error in permitting the State to introduce into evidence a message left on his cellular phone by Ms. Mitchell. The trial court allowed the recording to be introduced as an excited utterance under Rule 803(2) of the West Virginia Rules of Evidence.

We begin by noting that, under Rule 803(2), a statement is not excluded as hearsay if it is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2). In Syllabus points 7 and 8 of *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995), we held the following regarding Rule 803(2):

> 7. In order to qualify as an excited utterance under W. Va. R. Evid. 803(2): (1) the declarant must have experienced a startling event or condition; (2) the declarant must have reacted while under the stress or excitement of that event and not from reflection and fabrication; and (3) the statement must relate to the startling event or condition.
>
> 8. Within a W. Va. R. Evid. 803(2) analysis, to assist in answering whether a statement was made while under the stress or excitement of the event and not from reflection and fabrication, several factors must be considered, including: (1) the lapse of time between the event and the declaration; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements.

195 W.Va. 551, 466 S.E.2d 402.

This Court applied the principles set out in *Sutphin* in the case of *State v. Ferguson*, 216 W.Va. 420, 607 S.E.2d 526 (2004). In *Ferguson*, the defendant was convicted of first

---

17. It appears that Mr. Hughes actually called his grandmother and had his grandmother call Ms. Bly—such that a three-way telephone conversation took place.

18. Mr. Hughes informed the police that he went to Ms. Bly's apartment after Ms. Mitchell was killed. She was not at home.

degree murder. One of the issues raised on appeal involved the admission of evidence about an altercation between the defendant and the victim prior to the incident in which the victim was killed. We noted in *Ferguson* that "[t]his evidence came from friends of the victim, who testified at trial that the victim had told the friends that the [defendant] had threatened the victim with a knife during a heated conversation[.]" *Ferguson*, 216 W.Va. at 422, 607 S.E.2d at 528. We found the evidence to be admissible as follows:

> We have carefully reviewed the statements in question, which all of the evidence indicated were made by a person in an emotionally upset condition, just minutes after a frightening event. There was no evidence suggesting fabrication by the declarant. We agree with the trial court's conclusion that they were "excited utterances" and were admissible as such.

*Ferguson*, 216 W.Va. at 423, 607 S.E.2d at 529. *See State v. Harris*, 207 W.Va. 275, 531 S.E.2d 340 (2000) (finding no error in admitting, as excited utterances, statements by victim that defendant beat her).

In the instant proceeding, the evidence revealed that about an hour and twenty minutes before Ms. Mitchell was killed, she left several messages on Mr. Hughes' cell phone. In some of the messages, Ms. Mitchell asked Mr. Hughes to stop calling her. In the message that the State wanted introduced into evidence, which was made at 4:14 a.m. on June 12, 2004, Ms. Mitchell states: "So you gonna shoot up my apartment with my child here[?]" The trial court found that this statement was an excited utterance and therefore admissible under Rule 803(2). We agree.[19]

The statement Ms. Mitchell left on Mr. Hughes' cell phone clearly established that she believed Mr. Hughes was going to "shoot up" her apartment with her child present. Within an hour and twenty minutes of that statement, Mr. Hughes entered Ms. Mitchell's apartment. She was shot and killed while her child was present. We are satisfied that these facts establish that the 4:14 a.m. phone message was an excited utterance within the meaning of Rule 803(2). Consequently, the trial court did not abuse its discretion in admitting the evidence.

## IV.

### CONCLUSION

In view of the foregoing, we affirm the judgment convicting and sentencing Mr. Hughes for the crimes set out herein.

Affirmed.

---

**19.** The State wanted to introduce only the message left by Ms. Mitchell at 4:14 a.m. Counsel for Mr. Hughes, however, insisted that all messages left on the cell phone be played to the jury. The following exchange occurred regarding this issue:

> PROSECUTOR: Well, Your Honor, it won't be long before we play the phone messages, and Mr. Wooton (defense counsel) was going to let us know—I said that the State will take it either way—either just the 4:14 a.m. or all of the phone calls, but we need to know so we can adjust the tape.
>
> DEFENSE COUNSEL: We certainly want all the phone calls if we're going to do it. [The

State] has to still provide the proper foundation to get that in.

> THE COURT: Well, I understand that, but you want—if, in fact—if, in fact, they're played, you want every one of them played?
>
> DEFENSE COUNSEL: That's correct.
>
> THE COURT: Okay, all right.
>
> DEFENSE COUNSEL: Well, if there are phone calls between unrelated parties, I don't care about that.
>
> THE COURT: I don't know whether there are any of those. My review, I—
>
> DEFENSE COUNSEL: I think there's at least one. I don't care if you want to do it.
>
> THE COURT: Okay, we'll just play them …