# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term

No. 14-0438

FILED

**September 17, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
Plaintiff Below, Respondent

**V.**

**JEREMY LAMBERT,**
Defendant Below, Petitioner

---

Appeal from the Circuit Court of Raleigh County
Honorable Robert A. Burnside, Jr., Judge
Criminal Action No. 12-F-53

**AFFIRMED**

---

Submitted:  September 2, 2015
Filed: September 17, 2015

Mary Guy Dyer
Thomas G. Dyer
Dyer Law Offices
Clarksburg, West Virginia
Daniel C. Cooper
Cooper Law Offices, PLLC
Bridgeport, West Virginia
Attorneys for Petitioner

Kristen Keller
Raleigh County Prosecutor
Beckley, West Virginia
Attorney for Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "W. Va. Code, 61-2-1, enumerates three broad categories of homicide constituting first degree murder: (1) murder by poison, lying in wait, imprisonment, starving; (2) by any wilful, deliberate and premeditated killing; (3) in the commission of, or attempt to commit, arson, rape, robbery or burglary."  Syllabus point 6, *State v. Sims*, 162 W. Va. 212, 248 S.E.2d 834 (1978).

2.      "An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under *W. Va. Code*, 61-2-1, to set forth the manner or means by which the death of the deceased was caused."  Syllabus point 5, *State v. Bragg*, 160 W. Va. 455, 235 S.E.2d 466 (1977).

3.      "In West Virginia, (1) murder by any willful, deliberate and premeditated killing, and (2) felony-murder constitute alternative means under *W. Va. Code*, 61-2-1 [1987], of committing the statutory offense of murder of the first degree; consequently, the State's reliance upon both theories at a trial for murder of the first degree does not, *per se*, offend the principles of due process, provided that the two theories are

i

distinguished for the jury through court instructions; nor does the absence of a jury verdict form distinguishing the two theories violate due process, where the State does not proceed against the defendant upon the underlying felony." Syllabus point 5, *Stuckey v. Trent*, 202 W. Va. 498, 505 S.E.2d 417 (1998).

4.      "'Lying in wait' as a legal concept has both mental and physical elements. The mental element is the purpose or intent to kill or inflict bodily harm upon someone; the physical elements consist of waiting, watching and secrecy or concealment. In order to sustain a conviction for first degree murder by lying in wait pursuant to *W. Va. Code*, 61-2-1 [1987], the prosecution must prove that the accused was waiting and watching with concealment or secrecy for the purpose of or with the intent to kill or inflict bodily harm upon a person." Syllabus point 2, *State v. Harper*, 179 W. Va. 24, 365 S.E.2d 69 (1987).

5.      "Gross provocation and heat of passion are not essential elements of voluntary manslaughter, and, therefore, they need not be proven by evidence beyond a reasonable doubt. It is intent without malice, not heat of passion, which is the distinguishing feature of voluntary manslaughter." Syllabus point 3, *State v. McGuire*, 200 W. Va. 823, 490 S.E.2d 912 (1997).

6.      "The question of whether a defendant is entitled to an instruction on a

ii

lesser included offense involves a two-part inquiry.  The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense.  The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense."  Syllabus point 1, *State v. Jones*, 174 W. Va. 700, 329 S.E.2d 65 (1985).

7.      "Under Rule 611(a) of the West Virginia Rules of Evidence, a trial court has broad discretion in permitting or excluding the admission of rebuttal testimony, and this Court will not disturb the ruling of a trial court on the admissibility of rebuttal evidence unless there has been an abuse of discretion."  Syllabus point 2, *Belcher v. Charleston Area Medical Center*, 188 W. Va. 105, 422 S.E.2d 827 (1992).

8.      "Where the out-of-court statements of a non-testifying individual are introduced into evidence solely to provide foundation or context for understanding a defendant's responses to those statements, the statements are offered for a non-hearsay purpose and the introduction of the evidence does not violate the defendant's rights under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) and *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006)."  Syllabus point 4, *State v. Lambert*, 232 W. Va. 104, 750 S.E.2d 657 (2013).

9.      "An expert witness may testify about facts he/she reasonably relied upon to form his/her opinion even though such facts would otherwise be inadmissible as hearsay if the trial court determines that the probative value of allowing such testimony to aid the jury's evaluation of the expert's opinion substantially outweighs its prejudicial effect. If a trial court admits such testimony, the jury should be instructed that the otherwise inadmissible factual evidence is not being admitted to establish the truth thereof but solely for the limited purpose of informing the jury of the basis for the expert's opinion." Syllabus point 3, *Doe v. Wal-Mart Stores, Inc.*, 210 W. Va. 664, 558 S.E.2d 663 (2001).

10.      "Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term 'credibility' includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination." Syllabus point 4, *State v. Richey*, 171 W. Va. 342, 298 S.E.2d 879 (1982).

**Davis, Justice:**

This is a criminal appeal by Jeremy Lambert (hereinafter "Mr. Lambert") from his conviction and sentence by the Circuit Court of Raleigh County. Mr. Lambert was convicted of first-degree murder without mercy. He was sentenced by the circuit court to life imprisonment without the possibility of parole. In this appeal, Mr. Lambert has made the following assignments of error: (1) erroneous rulings on felony-murder and lying-in-wait murder theories, (2) error in refusing to give a voluntary manslaughter jury instruction, (3) improper examination of a rebuttal witness by the State, (4) error in admitting a recording of a psychiatric interview of Mr. Lambert, (5) error in limiting the testimony of Mr. Lambert's expert, (6) improper cross-examination of Mr. Lambert's expert, and (7) prejudice resulting from the cumulative effect of the errors. After a careful review of the briefs, the record submitted on appeal, and listening to the arguments of the parties, we affirm.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The facts of this case involve the killing of twenty-five-year-old Cyan Maroney (hereinafter "Ms. Maroney"). In 2011, Ms. Maroney shared an apartment with three roommates in Beckley, West Virginia.[1] Ms. Maroney was a professional ballet dancer who

---

[1]The roommates were two females, Katherine Houff and Catherine Claus, and one male, Aymen Robertson.

performed with the West Virginia Dance Company and Theatre West Virginia.[2]  She was also employed at the Tamarack in Beckley.  Mr. Lambert began a relationship with Ms. Maroney in May 2011.  The relationship ended in September 2011.

The events leading up to Mr. Lambert's prosecution for the murder of Ms. Maroney began in the early evening hours of October 2, 2011.  On that date, at around 6:42 p.m., Mr. Lambert went to a Walmart store in Beckley and purchased a 14-inch Bowie knife.  After purchasing the knife, Mr. Lambert sat in his car in the Walmart parking lot for a short while before driving to Ms. Maroney's apartment.[3]  Mr. Lambert reached Ms. Maroney's apartment at around 8:15 p.m.  According to Mr. Lambert, Ms. Maroney came out of the apartment and met him at his car.  They spoke briefly before she returned to the apartment.  Ms. Maroney came back outside and spoke with Mr. Lambert a second time before again returning to her apartment.

After Ms. Maroney returned to her apartment the second time, Mr. Lambert hid the Bowie knife in his pants and entered her apartment.[4]  One of Ms. Maroney's roommates, Katherine Houff ("Ms. Houff"), saw Mr. Lambert enter the apartment and walk into Ms.

---

[2]Ms. Maroney's roommates were also professional dancers.

[3]It appears that Mr. Lambert had earlier arranged to meet Ms. Maroney at her apartment when she got off from work.

[4]The door was not locked.

2

Maroney's bedroom.[5] While inside the bedroom, Mr. Lambert stabbed Ms. Maroney twenty-three times. Stab wounds were inflicted to her thoracic aorta, esophagus, face, stomach, diaphragm, liver, lungs, kidney, spleen, and skull. Ms. Maroney's roommates heard her screaming during the attack and came to her bedroom door, but did not enter. Ms. Houff testified that she saw Mr. Lambert leaving Ms. Maroney's bedroom carrying a large "bloody knife."[6] Ms. Houff testified further that, as Mr. Lambert left the apartment, she believed he stated, "That'll show that m . . . f . . . to leave me." Ms. Maroney bled to death before reaching the hospital.

Mr. Lambert was arrested several hours after he killed Ms. Maroney. In January 2012, a grand jury returned a one count indictment charging Mr. Lambert with first-degree murder in causing the death of Ms. Maroney. The case went to trial on February 24, 2014. Mr. Lambert took the stand during the trial and admitted that he killed Ms. Maroney. However, Mr. Lambert's defense was that he suffered from diminished capacity at the time of the killing. On March 6, 2014, the jury returned a verdict finding Mr. Lambert guilty of first-degree murder, without a recommendation of mercy. This appeal followed.

---

[5]Another roommate, Catherine Claus ("Ms. Claus"), was in the apartment, but she was in her bedroom. The third roommate, Aymen Robertson ("Ms. Robertson"), came home a few minutes after Mr. Lambert entered Ms. Maroney's bedroom.

[6]Ms. Claus and Mr. Robertson also testified to seeing Mr. Lambert exit the bedroom carrying a large knife covered in blood.

3

## II.

## STANDARD OF REVIEW

Mr. Lambert asserts seven assignments of error. The issues presented have specific review standards. Therefore, we will dispense with setting out a general standard of review. Specific standards of review will be discussed separately as we address each assignment of error.

## III.

## DISCUSSION

In this appeal, the issues assigned for our review by Mr. Lambert are as follows: (1) erroneous rulings on felony-murder and lying-in-wait murder theories, (2) error in refusing to give a voluntary manslaughter jury instruction, (3) improper examination of a rebuttal witness by the State (4) error in admitting a recording of a psychiatric interview of Mr. Lambert, (5) error in limiting the testimony of Mr. Lambert's expert, (6) improper cross-examination of Mr. Lambert's expert, and (7) prejudice resulting from the cumulative effect of the errors. We will consider each assignment of error separately.

### A. Felony-Murder and Lying-in-Wait Murder Theories

The trial court instructed the jury on three theories of first-degree murder: premeditated murder, felony-murder, and lying-in-wait murder. Mr. Lambert contends that

he was not indicted on the theories of felony-murder and lying-in-wait; therefore, those theories should not have been presented to the jury. Mr. Lambert also contends, as an alternative argument, that the State should have been required to make an election on which theory of murder would be presented to the jury. Finally, Mr. Lambert argues that the trial court improperly instructed the jury on the lying-in-wait murder theory. We will address these issues separately below.

**1. Injecting felony-murder and lying-in-wait murder theories into the case.** Mr. Lambert correctly argues that the indictment did not expressly charge him with felony-murder and lying-in-wait murder. However, the trial court permitted the State to present both theories to the jury and instructed the jury on the same. Mr. Lambert argued below and on appeal that he "had been indicted on first degree premeditated murder and had received no notice of the State's intent to prosecute him on felony murder and murder by lying in wait." Consequently, Mr. Lambert contends that he could not be prosecuted for felony-murder and lying-in-wait murder, as those theories were not expressly set out in the indictment.

As an initial matter, this Court has "recognized that *de novo* review is applied when the sufficiency of an indictment is questioned." *State v. Corra*, 223 W. Va. 573, 578, 678 S.E.2d 306, 311 (2009) (citation omitted). Further, "[a]n indictment need only meet

5

minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Syl. pt. 2, in part, *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535 (1996).

We have held that our homicide statute, "W. Va. Code, 61-2-1, enumerates three broad categories of homicide constituting first degree murder: (1) murder by poison, lying in wait, imprisonment, starving; (2) by any wilful, deliberate and premeditated killing; (3) in the commission of, or attempt to commit, arson, rape, robbery or burglary." Syl. pt. 6, *State v. Sims*, 162 W. Va. 212, 248 S.E.2d 834 (1978). The first category of first-degree murder contains the lying-in-wait theory and the third category for first degree murder is the felony-murder component.

We have, on several occasions, been called upon to address the issue of whether a defendant may be prosecuted on a felony-murder theory when the indictment did not expressly set out this theory.[7] For example, in the case of *State v. Bragg*, 160 W. Va. 455, 235 S.E.2d 466 (1977), we addressed the issue of whether an indictment for first-degree premeditated murder had to set out a specific count alleging felony-murder in order for the

---

[7]Although it does not appear that we have addressed the issue of prosecuting a defendant on a lying-in-wait theory of murder that was not expressly set out in an indictment, obviously this issue should be resolved in the same manner as the felony-murder issue.

6

State to present the issue to the jury. The indictment in *Bragg* merely stated that the defendant did "feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully" kill the victim. *See Bragg*, 160 W. Va. at 463, 235 S.E.2d at 471. However, during the State's opening statement in *Bragg*, it announced that it would present evidence to support a felony-murder conviction.[8] The jury ultimately was instructed on felony-murder and premeditated murder. The defendant was convicted of premeditated murder. On appeal, the defendant argued that it was error for the court to instruct the jury on felony-murder because the indictment did not charge such offense. This Court, in affirming the conviction, held the following in Syllabus point 5 of *Bragg*:

> An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under *W. Va. Code*, 61-2-1, to set forth the manner or means by which the death of the deceased was caused.

160 W. Va. 455, 235 S.E.2d 466.

The holding in *Bragg* was applied in *State v. Satterfield*, 193 W. Va. 503, 457 S.E.2d 440 (1995). The opinion in *Satterfield* addressed the *Bragg* felony-murder issue as follows:

---

[8]Rape of the victim was the underlying crime to sustain the felony-murder theory.

7

According to the appellant, the indictment charged him with "feloniously, maliciously, deliberately and unlawfully . . . slay[ing], kill[ing], and murder[ing] one Billy Harper[.]" The appellant argues that since the indictment did not reflect that the murder occurred during a robbery, it was error for the trial judge to read instructions regarding felony murder. However, this argument has been rejected previously by this Court in [*Bragg*,] a case in which the defendant was convicted under the theory of felony murder. . . . Thus, it is clear that the indictment did not need to specifically charge the appellant with felony murder. Additionally, it follows that it was not error for the trial judge to read instructions regarding felony murder.

*Satterfield*, 193 W. Va. at 513, 457 S.E.2d at 450.

The decision in *Bragg* also was applied in *State v. Hughes*, 225 W. Va. 218, 691 S.E.2d 813 (2010). We said the following in *Hughes*:

In the instant proceeding, the indictment charged only that Mr. Hughes "did unlawfully, feloniously, maliciously, willfully, deliberately and with premeditation slay, kill and murder one Sacha Mitchell." During the State's opening statement, it indicated that, in addition to a premeditated murder theory, the case would also be prosecuted on a felony murder theory with burglary being the underlying felony. Although Mr. Hughes now contends that he was unfairly surprised by the felony murder theory because it was not set out in the indictment, our precedents clearly permitted the State to proceed on a felony murder theory.

*Hughes*, 225 W. Va. at 225, 691 S.E.2d at 820. *See also State v. Justice*, 191 W. Va. 261, 445 S.E.2d 202 (1994) (holding that State could present felony-murder theory even though indictment did not specifically charge felony murder); *State v. Young*, 173 W. Va. 1, 311 S.E.2d 118 (1983) (same).

8

In the instant proceeding, the indictment charged only that Mr. Lambert "did unlawfully, feloniously, maliciously, willfully, deliberately and with premeditation slay, kill and murder one Cyan Maroney[.]" Three days before the conclusion of the trial, the State tendered jury instructions to the trial court that contained felony-murder and lying-in-wait murder theories.[9] The State argued, and the trial court agreed, that the evidence supported instructions on those theories.[10] Mr. Lambert contends that he was unfairly surprised by the injection of felony-murder and lying-in-wait theories. Based upon our precedents, he should not have been surprised. Our precedents clearly placed him on notice that an indictment which sets forth a charge of only premeditated murder does not preclude the other categories of first-degree murder from being used in a prosecution when the evidence supports them. *See* W. Va. Code § 61-2-1 (1991) (Repl. Vol. 2014) ("In an indictment for murder . . . , it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the

---

[9]Burglary was the purported underlying felony for the felony-murder theory.

[10]The actual verdict form was not made part of the record in this appeal. Further, Mr. Lambert's brief does not indicate that the verdict form contained entries for each theory of first-degree murder. Consequently, it is assumed that a general verdict was returned. *See Stuckey v. Trent*, 202 W. Va. 498, 505, 505 S.E.2d 417, 424 (1998) ("[N]or does the absence of a jury verdict form distinguishing [multiple] theories violate due process."). It also will be noted that, when the jury returned its verdict, the trial court read the following from the verdict form:

> THE COURT: The verdict form provides the following:
> On the charge of first-degree murder, "We, the jury, on the issues joined, find the Defendant, Jeremy Lambert, guilty of first-degree murder."

9

defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased."). Consequently, we find no merit to this assignment of error.[11]

**2. Election of murder theory.** Mr. Lambert argued below, and also argues in this appeal that the State should have been required to elect which murder theory would be presented to the jury. This Court has held that "[t]he granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discretion." Syl. pt. 3, *State v. Walker*, 188 W. Va. 661, 425 S.E.2d 616 (1992).

The issue of election of first-degree murder theories previously has been addressed by this Court. For example, in the seminal case of *Stuckey v. Trent*, 202 W. Va. 498, 505 S.E.2d 417 (1998), we addressed the issue of election between premeditated murder and felony-murder. The decision in *Stuckey* was an appeal by the defendant from a trial

---

[11]We wish to make clear that we were not asked under this assignment of error to decide whether the evidence supported granting instructions on felony-murder and lying-in-wait murder. Mr. Lambert presented the narrow argument of lack of notice and did not attack the sufficiency of the evidence to warrant such instructions in this assignment of error. Assuming, for the sake of argument, that the evidence was insufficient to permit instructions on felony-murder and lying-in-wait murder, this error alone would not warrant a new trial because the evidence was sufficient beyond a reasonable doubt to sustain a conviction for premeditated murder. *See* Syl. pt. 4, *State v. Berry*, 227 W. Va. 221, 707 S.E.2d 831 (2011) ("When a defendant is prosecuted on alternative theories of first-degree murder, a verdict against the defendant will stand if the evidence is sufficient to establish guilt beyond a reasonable doubt on any of the alternative first-degree murder theories.").

court's order denying him habeas corpus relief. The defendant was convicted of seven counts of murder in the first-degree in 1989, and was given seven consecutive life sentences. In the habeas proceeding, this Court addressed the issue of whether the trial court in the underlying case committed error in not requiring the State to elect between premeditated murder and felony-murder. The defendant contended in the habeas appeal that the State's failure to elect rendered his trial unfair and constituted a denial of his right to due process. We rejected this contention. In doing so, the following principle of law was set out in Syllabus point 5 of *Stuckey*:

> In West Virginia, (1) murder by any willful, deliberate and premeditated killing, and (2) felony-murder constitute alternative means under *W. Va. Code*, 61-2-1 [1987], of committing the statutory offense of murder of the first degree; consequently, the State's reliance upon both theories at a trial for murder of the first degree does not, *per se*, offend the principles of due process, provided that the two theories are distinguished for the jury through court instructions; nor does the absence of a jury verdict form distinguishing the two theories violate due process, where the State does not proceed against the defendant upon the underlying felony.

202 W. Va. 498, 505 S.E.2d 417. *See also Hughes*, 225 W. Va. at 226, 691 S.E.2d at 821 ("Under the decision in *Stuckey*, the State may seek a conviction for felony murder and premeditated murder so long as the trial court instructs the jury on the distinction between the two theories.").

In the instant proceeding, the trial court followed the decision in *Stuckey* and

11

instructed the jury separately on each theory of first-degree murder. Consequently, the trial

court did not abuse its discretion in denying Mr. Lambert's request to force the State to make

an election between the murder theories.

**3. Jury instruction on lying-in-wait murder.** Mr. Lambert also contends

that the trial court's instruction on lying-in-wait murder was a misstatement of the law.[12] We

have held that "the question of whether a jury was properly instructed is a question of law,

and the review is *de novo*." Syl. pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d

257 (1996).

We addressed the elements of lying-in-wait murder in *State v. Harper*, 179

W. Va. 24, 365 S.E.2d 69 (1987). In that decision, we held the following:

> "Lying in wait" as a legal concept has both mental and
> physical elements. The mental element is the purpose or intent
> to kill or inflict bodily harm upon someone; the physical
> elements consist of waiting, watching and secrecy or

---

[12]In this assignment of error, Mr. Lambert mentions in passing that he objected to the lying-in-wait murder instruction at trial on three grounds. The grounds for the objection at trial were "that *the State did not present evidence sufficient to justify such an instruction*, because the defendant had not received notice of this theory of murder and because the instruction was not a correct statement of the law." (Emphasis added). Other than making a passing reference to an insufficiency objection at trial, Mr. Lambert did not brief that issue as an assignment of error on appeal. We have noted on many occasions that "casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." *State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995). *See* note 11, *supra*, for related comments.

concealment. In order to sustain a conviction for first degree murder by lying in wait pursuant to *W. Va. Code*, 61-2-1 [1987], the prosecution must prove that the accused was waiting and watching with concealment or secrecy for the purpose of or with the intent to kill or inflict bodily harm upon a person.

Syl. pt. 2, *Harper*, 179 W. Va. 24, 365 S.E.2d 69. Under *Harper*, a jury should be instructed

on the mental and physical elements of lying-in-wait murder. Those elements are intent to

kill or harm, waiting, watching, and concealment or secrecy.

In the instant case, the trial court gave the following instruction on the elements

of lying-in-wait murder:

A person is guilty of first-degree murder by lying in wait when the defendant waits and watches, in either concealment or in secrecy, for the purpose of or with the intent to kill or inflict bodily harm upon another. In order to prove a defendant guilty of first-degree murder by lying in wait, it is not required that there be any proof that the defendant acted with the specific intent to kill or with premeditation. In order to prove lying in wait, the State is not required to prove that the killer was concealed or that the victim was unaware of his presence. A defendant acts in secrecy when he relies on the element of surprise in order to carry out his intent to kill or inflict bodily harm.

Bodily harm means either substantial physical pain or any impairment of physical condition. If one places himself in a position to make a private attack upon his victim and attacks the victim when the victim does not know or is not aware of his purpose to kill or inflict bodily harm, the killing constitutes first-degree murder by lying in wait.

Therefore, if you find from the evidence beyond a reasonable doubt that this Defendant, Jeremy Lambert, placed

13

himself in a position to make a private attack upon Cyan Maroney and attacked her when she did not know of his purpose to kill her or to cause her bodily harm, then you may find this Defendant guilty of first-degree murder as charged in the indictment.

We believe that the trial court's lying-in-wait instruction is not a correct formulation of *Harper*.

To begin, the last two sentences of the first paragraph in the instruction are confusing and misleading. As pointed out in Mr. Lambert's brief, under the formulation of the last two sentences "all murders would be murder by lying in wait unless the Defendant made an announcement or warned the victim of his or her intent to kill." This is to say that the last two sentences negate the requirement of waiting, watching and concealment or secrecy.

Furthermore, the last two paragraphs of the instruction were taken from dicta in a footnote in our decision in *Berry*. The *Berry* defendant was prosecuted for premeditated murder and lying-in-wait murder in causing the death of two victims. On appeal, the defendant argued that the evidence was insufficient to sustain convictions for lying-in-wait murder. The defendant conceded, however, that the evidence was sufficient to sustain convictions for the premeditated murder theory. As a consequence of this concession, we determined that the lying-in-wait assignment of error had no merit. Nevertheless, in a

14

footnote, the opinion cited to the *Harper* formulation of the elements of lying-in-wait murder and concluded that the evidence was sufficient to establish those elements. Merely in passing, the opinion cited to the following case from another jurisdiction:

> *See State v. Leroux*, 326 N.C. 368, 390 S.E.2d 314, 320 (1990) ("'If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait.'" (quoting *State v. Allison*, 298 N.C. 135, 257 S.E.2d 417, 425 (1979))).

*Berry*, 227 W. Va. at 230 n.21, 707 S.E.2d at 840 n.21. Our citation to *Leroux* was not intended as an adoption of North Carolina's formulation of lying-in-wait murder. *See Croft v. TBR, Inc.*, 222 W. Va. 224, 232, 664 S.E.2d 109, 117 (2008) ("New rules of law are announced in syllabus points, not in footnotes."). *Leroux* was cited merely to show that an assailant can be visible in a driveway when a sudden attack is made, as occurred in *Berry*.[13] It was error for the circuit court to instruct the jury using the *Leroux* standard for lying-in-wait murder.

Even though we find that the instruction on lying-in-wait was incorrect, this

---

[13]In *Berry*, the defendant was waiting in the driveway of one of the victims, his former girlfriend, during late evening hours. When his former girlfriend pulled into her driveway with her new boyfriend in her car, the defendant immediately began shooting into the car at the new boyfriend before shooting his former girlfriend. The opinion noted that "[t]estimony was presented by the apartment manager and a law enforcement officer that [the defendant] would not have been visible to Ms. Mills until she pulled into the driveway." *Berry*, 227 W. Va. at 230 n.21, 707 S.E.2d at 840 n.21.

error was harmless. *See Miller*, 197 W. Va. at 607, 476 S.E.2d at 554 (1996) ("An erroneous instruction requires a new trial unless the error is harmless."). As we previously noted, Mr. Lambert was prosecuted on three theories of murder. Insofar as we have determined that the evidence was sufficient to support one of the theories–premeditated murder-the error in the lying-in-wait instruction would not have altered the outcome of the verdict. *See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) ("Considering the entire record, we conclude that the erroneous jury charge did not result in 'actual harm' to appellant.").

## B. Refusal to Give a Voluntary Manslaughter Instruction

The next issue presented by Mr. Lambert is his contention that the trial court erred in refusing his request to have the jury instructed on voluntary manslaughter. "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion." Syl. pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257.

In *State v. McGuire*, 200 W. Va. 823, 490 S.E.2d 912 (1997), we commented on the requirements for showing voluntary manslaughter as follows: "Gross provocation and heat of passion are not essential elements of voluntary manslaughter, and, therefore, they need not be proven by evidence beyond a reasonable doubt. It is intent without malice, not heat of passion, which is the distinguishing feature of voluntary manslaughter." Syl. pt. 3, *McGuire*, *id.* *See also State v. Whittaker*, 221 W. Va. 117, 127, 650 S.E.2d 216, 226 (2007)

16

("The absence of malice distinguishes the crime of voluntary manslaughter from the crime of murder."). In the case of *State v. Jones*, 174 W. Va. 700, 329 S.E.2d 65 (1985), we set out a two-part inquiry for deciding whether an instruction on a lesser included offense should be given:

> The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. *State v. Neider*, 170 W. Va. 662, 295 S.E.2d 902 (1982).

Syl. pt. 1, *Jones*, 174 W. Va. 700, 329 S.E.2d 65.

The decisions of this Court have recognized that voluntary manslaughter, a felony under W. Va. Code § 61-2-4 (1994) (Repl. Vol. 2014), is a lesser included offense of murder. *See State v. Skeens*, 233 W. Va. 232, 239, 757 S.E.2d 762, 769 (2014); *State v. Guthrie*, 194 W. Va. 657, 671, 461 S.E.2d 163, 177 (1995). Therefore, our inquiry under *Jones* is only a factual one.

Mr. Lambert contends that the facts demonstrate that he was entitled to an instruction on voluntary manslaughter based upon the testimony of his expert, Dr. Lawson Bernstein. According to Mr. Lambert, Dr. Bernstein testified that he suffered from

17

diminished capacity [14] at the time of the killing because he

> suffered from multiple mental disorders including post-traumatic stress disorder, a mood disorder (either major depressive disorder or bi-polar II disorder), a mixed personality disorder with prominent borderline features and alcohol dependence, and that these mental diseases or defects rendered [him] incapable of premeditating or formulating the intent to kill Cyan Maroney.

The State argues that the facts show that Mr. Lambert did not present sufficient evidence to warrant a voluntary manslaughter instruction. Specifically, the State contends that Mr. Lambert "apparently concedes, there was no evidence that, due to a mental disease or defe[ct], [he] lacked the capacity to form malice, being the element that distinguishes

---

[14]We have held the following regarding the diminished capacity defense:

> The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense.

Syl. pt 3, *State v. Joseph*, 214 W. Va. 525, 590 S.E.2d 718 (2003). What should be clear about the diminished capacity defense is that "[t]he existence of a mental illness is not alone sufficient to trigger a diminished capacity defense. It must be shown by psychiatric testimony that some type of mental illness rendered the defendant incapable of forming the specific intent elements." *State v. Simmons*, 172 W. Va. 590, 600, 309 S.E.2d 89, 99 (1983). *Accord State v. Skeens*, 233 W. Va. 232, 239-40, 757 S.E.2d 762, 769-70 (2014).

18

murder from manslaughter."

The record in this case demonstrates that Mr. Lambert conceded during the selection of jury instructions that Dr. Bernstein did not opine that he lacked the capacity to form malice when he killed Ms. Maroney. Specifically, Mr. Lambert asked the trial court to strike the following language from a jury instruction that he tendered concerning malice: "The last – next-to-last sentence where it says, 'or that he was not capable of doing so with malice as the result of his mental disease or disorder.'" Our review of the testimony of Dr. Bernstein and the lower court concession by Mr. Lambert makes it clear that the trial court properly denied the request for an instruction on voluntary manslaughter. We pointed out previously that malice is the key element that distinguishes murder from voluntary manslaughter. Without evidence showing that Mr. Lambert's mental disease made him incapable of forming malice at the time of the killing, an instruction on voluntary manslaughter was correctly rejected.[15] Consequently, we find no merit to this assignment of

---

[15]In our review of the record, it appears that the trial court rejected the instruction on voluntary manslaughter specifically because of the absence of any evidence of provocation. This ground is not inconsistent with our determination that no evidence of a mental disease was presented to show that Mr. Lambert lacked the capacity to form malice. This is because "provocation is used to reduce a murder charge to voluntary manslaughter by negating the element of malice where the killing was committed in the heat of passion." *State v. Wade*, 200 W. Va. 637, 645, 490 S.E.2d 724, 732 (1997). *See also State v. Coles*, 234 W. Va. 132, 139 n.18, 763 S.E.2d 843, 850 n.18 (2014) ("Although we reject the grounds relied upon by the circuit court, we are free to affirm on different grounds."); Syl. pt. 3, *Barnett v. Wolfolk*, 149 W. Va. 246, 140 S.E.2d 466 (1965) ("This Court may, on
(continued...)

19

error.

### C. The State's Examination of a Rebuttal Witness

Mr. Lambert next contends that the trial court permitted the State to improperly conduct direct examination of a rebuttal witness. We generally have held that "[a] trial court has wide latitude in the conduct of a trial, and particularly in matters pertaining to the examination of witnesses, and its rulings in relation to the examination of witnesses will not be reversed except when there has been a plain abuse of its discretion." *State v. Layton*, 189 W. Va. 470, 502-03, 432 S.E.2d 740, 772-73 (1993) (internal quotations and citation omitted). More specifically, in Syllabus point 2 of *Belcher v. Charleston Area Medical Center*, 188 W. Va. 105, 422 S.E.2d 827 (1992), we held:

> Under Rule 611(a) of the West Virginia Rules of Evidence, a trial court has broad discretion in permitting or excluding the admission of rebuttal testimony, and this Court will not disturb the ruling of a trial court on the admissibility of rebuttal evidence unless there has been an abuse of discretion.

In this case, the State called Jennifer Osborne as a rebuttal witness. Ms. Osborne was called to testify about a past relationship she had had with Mr. Lambert that

---

[15](...continued) appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment.").

20

included acts of domestic violence.[16]  During the initial questioning of Ms. Osborne, she informed the jury that she was a medical doctor, certified in internal medicine, and that she worked at the University of Virginia Hospital.  Mr. Lambert objected to this background information as irrelevant because Ms. Osborne was not testifying as an expert.[17]

Mr. Lambert did not cite, either below nor in this appeal, to any legal authority that precludes general background information from being given by a witness.  Such preliminary information is, in fact, relevant for the jury to have some knowledge about the person testifying before them.  The court in *McDaniel v. Commonwealth*, 415 S.W.3d 643 (Ky. 2013), addressed this issue.

The defendant in *McDaniel* was convicted of two counts of first-degree assault and of being a persistent felony offender.  One of the issues raised on appeal was that the

---

[16]Mr. Lambert appears to have dated Ms. Osborne briefly while they were in high school together.  Several years after the relationship ended, Mr. Lambert harassed and intimidated Ms. Osborne while she was attending college.

[17]Mr. Lambert also complains on appeal that the State improperly referred to Ms. Osborne as "Dr. Osborne" in order to bolster her testimony.  The State notes that this issue is waived because Mr. Lambert did not object during the trial to its reference to Ms. Osborne as "Dr. Osborne".  We agree with the State that this issue was not properly preserved. *See Petition of Thompson*, 191 F. Supp. 545, 549 (D.N.J. 1961) ("No objection by petitioner was made to any question to a witness in which Brady was referred to as a doctor, and therefore, no reviewable error was preserved, nor is any harmful error apparent upon the record.").  Moreover, even if the issue was properly preserved, we would find no merit in the argument.

prosecutor was improperly allowed to solicit background information about a doctor who was testifying as a fact witness. The opinion in the case rejected this argument as follows:

> Appellant's first issue with the testimony of Dr. Borzada is that the doctor was allowed to briefly testify to his education and training experience. Appellant claims that, if Dr. Borzada was testifying as a lay witness, he should not have been allowed to testify as to his qualifications. Appellant does not cite any cases holding that a lay witness may not answer questions about his background. Obviously, background information is relevant to jurors in that it aids in assessing the credibility of fact witnesses and in determining the weight to give their testimony–questions within the unique province of the jury. Whether Dr. Borzada was testifying as a lay witness or as an expert, there was nothing inappropriate with the Commonwealth establishing his credibility by inquiring into his background.

*McDaniel*, 415 S.W.3d at 654.

We agree with the analysis by *McDaniel* and, therefore, find no merit to this assignment of error by Mr. Lambert.

### D. Admission of a Tape Recorded Psychiatric Interview of Mr. Lambert

Mr. Lambert additionally contends that the trial court committed error in permitting the State to introduce evidence of a tape recorded interview he had with a psychiatrist, Dr. Bobby Miller. Mr. Lambert objected to the introduction of the tape recording of "the interview on the basis that the statements made by Dr. Miller would be

22

hearsay and inadmissible."[18]  The State contends that certain trial testimony of Mr. Lambert

was inconsistent with statements he made to Dr. Miller; therefore, the tape recording was

admissible in its entirety for impeachment purposes.

This Court held in Syllabus point 2 of *State v. Doonan*, 220 W. Va. 8, 640

S.E.2d 71 (2006), that:

> The action of a trial court in admitting or excluding
> evidence in the exercise of its discretion will not be disturbed by
> the appellate court unless it appears that such action amounts to
> an abuse of discretion.  Syl. pt. 10, *State v. Huffman*, 141 W. Va.
> 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State
> ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994).

The following principles have been observed regarding the admission of

impeachment evidence:

> A statement that is offered to impeach the witness's
> credibility should not be excluded on the grounds of hearsay.  A
> prior inconsistent or contradictory statement is not offered to
> prove the truth of the prior out-of-court statement. . . .  It is
> offered to raise an inference as to the poor general credibility of
> the witness as to all his or her testimony. . . .

---

[18]Mr. Lambert mentions in passing in his brief that the trial court did not allow
him to call Dr. Miller as a witness.  However, this issue was not made an assignment of error.
We therefore deem this issue to be waived.  *See Tiernan v. Charleston Area Med. Ctr., Inc.*,
203 W. Va. 135, 140 n.10, 506 S.E.2d 578, 583 n.10 (1998) ("Issues not raised on appeal or
merely mentioned in passing are deemed waived." (citation omitted)).

Hearsay statements should not be admitted under the ruse of impeachment, and this is particularly so when the probative alue is substantially outweighed by the prejudicial effect. On the other hand, if the evidence is strongly probative on credibility, the court has discretion to admit the statement, but a limiting instruction should be given.

2 Louis J. Palmer, Jr., Robin Jean Davis, & Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 802.06[2], at 271-72 (6th ed. 2015). Further, this Court also has held that:

[W]here a person accused of committing a crime makes a voluntary statement which is . . . inadmissible in the State's case-in-chief . . ., the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony inconsistent with the prior voluntary statement.

*State v. Knotts*, 187 W. Va. 795, 804, 421 S.E.2d 917, 926 (1992). Additionally, we have "recognized that a statement is not hearsay if such statement is offered against a party and is his own statement, in either his individual or representative capacity." *State v. Payne*, 225 W. Va. 602, 610-11, 694 S.E.2d 935, 943-44 (2010). Finally, we have held that:

Where the out-of-court statements of a non-testifying individual are introduced into evidence solely to provide foundation or context for understanding a defendant's responses to those statements, the statements are offered for a non-hearsay purpose and the introduction of the evidence does not violate the defendant's rights under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) and *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

Syl. pt. 4, *State v. Lambert*, 232 W. Va. 104, 750 S.E.2d 657 (2013).

24

The record in the instant case indicates that, during the direct testimony of Mr. Lambert, the following exchange occurred with his counsel:

> Q. Jeremy, did you kill this young lady?
>
> A. Yes, I did. I don't remember doing it but, yes, I did.
>
> Q. Why? Why did you do that?
>
> A. I don't know. She did nothing to me that I know of.

Mr. Lambert's response to the above questions prompted the State to ask him the following questions during cross-examination:

> Q. Dr. Bobby Miller was a psychiatrist chosen by your defense lawyer, Joe Noggy, correct?[19]
>
> A. Yes.
>
> Q. And when you were interviewed on November 9, 2011, about a month after the murder, you explained to Bobby Miller that you killed Cyan because you were, quote, pissed off; correct?
>
> A. I don't recall that.
>
> Q. Did you also tell Bobby Miller that it was because of jealousy?
>
> A. I don't recall saying that.
>
> Q. Do you recall Bobby Miller giving you some advice about what you should be saying to avoid a first-degree murder conviction?

---

[19]It appears that Mr. Noggy withdrew as trial counsel before the trial began, and Mr. Lambert retained different counsel.

A. No.

(Footnote added).  After Mr. Lambert's answer to the last question, the State moved the trial court to introduce the entire tape recording of the interview Mr. Lambert had with Dr. Miller.[20]  Mr. Lambert objected solely on the grounds that Dr. Miller's statements were inadmissible hearsay.[21]  It appears that Mr. Lambert also asked the trial court to limit this evidence only to matters that may have been inconsistent with his trial testimony.[22]  The trial court overruled the objection and allowed the entire tape recording of the interview to be

---

[20]The State indicated during the trial that a small part of the interview had been redacted.

[21]To be clear, Mr. Lambert did not argue below or in this appeal that the principles of *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), were violated by the introduction of Dr. Miller's statements.  We held in Syllabus point 6 of *Mechling*:

> Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

219 W. Va. 366, 633 S.E.2d 311.

[22]Mr. Lambert further suggested that the tape recording not be played and that only portions of the transcript be used.

26

played for the jury.[23]

To the extent that statements during the interview with Dr. Miller concerned the questions upon which the State sought to impeach Mr. Lambert, those statements were properly admitted. However, we are concerned that the trial court allowed the entire interview to be played to the jury.[24] Even though we have grave concerns about the admissibility of the entire tape recording, we are unable to weigh the prejudicial impact, if any, of such evidence. Mr. Lambert did not designate the tape recording or transcript as part of the record in this appeal. Without a review of such evidence this Court simply cannot assess the impact of the recording or determine whether it was properly admitted in its entirety. Mr. Lambert had the "burden of demonstrating that substantial rights were affected by the [alleged] error." *State v. Blake*, 197 W. Va. 700, 705, 478 S.E.2d 550, 555 (1996). He has failed to carry his burden by not providing an adequate record for review of this assignment of error. We therefore find no merit to this issue.

---

[23]The jury also was given slightly redacted transcripts of the interview.

[24]In this appeal, Mr. Lambert argues that the interview with Dr. Miller "contained numerous incriminating statements." The State points out that Mr. Lambert did not object, at the trial level, on the grounds that self-incriminating statements by him were contained in the tape recording. Consequently, the State contends this specific issue is waived. We agree with the State the issue has been waived. *See* Syl. pt. 2, *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 470 S.E.2d 162 (1996) ("To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect.").

27

### E. Limiting the Testimony of Mr. Lambert's Expert

The next issue raised by Mr. Lambert concerns the testimony of his expert witness, Dr. Bernstein, on the defense of diminished capacity. Mr. Lambert argues that the trial court improperly restricted the testimony of Dr. Bernstein. The State takes the position that Mr. Lambert did not preserve this issue for review because he did not make a specific objection at trial; he failed to argue on appeal exactly what evidence was excluded at trial; and he conceded during closing arguments that the diminished capacity defense was not established.

We have held that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syl. pt. 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991). *See also Watson v. Inco Alloys Int'l, Inc.*, 209 W. Va. 234, 238, 545 S.E.2d 294, 298 (2001) ("When considering the propriety of a circuit court's decision whether to admit the testimony of an expert witness, we will reverse only for a clear abuse of discretion.").

We begin by noting that there is no question in this appeal that Dr. Bernstein

28

qualified as an expert under Rule 702 of the West Virginia Rules of Evidence,[25] and that he

could render an opinion on the defense of diminished capacity.  The issue raised in this case

concerns the application of the trial court's discretion to place limitations on an expert's

testimony.  This issue involves the interplay of Rules 703 and 705 of the West Virginia Rules

of Evidence.  At the time of Mr. Lambert's trial, those rules were set out as follows:

> Rule 703. Bases of opinion testimony by experts.  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

> Rule 705. Disclosure of facts or data underlying expert opinion.  The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise.  The expert may in any event be required to disclose the underlying facts or data on cross-examination.[26]

(Footnote added).  The Fourth Circuit made the following comment on Rule 703 and Rule

---

[25]At the time of Mr. Lambert's trial, Rule 702 was set out as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Subsequent to Mr. Lambert's trial, Rule 702 was amended.  The amendment has no effect on the issues in this case.

[26]Subsequent to Mr. Lambert's trial, Rules 703 and 705 were amended. The amendments have no effect on the issues in this case.

705:

> Rule 703 creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion; Rule 705 is the cross-examiner's sword, and, within very broad limits, he may wield it as he likes.

*United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1135 (4th Cir. 1991).

Although, at first blush, it may appear that Rules 703 and 705 grant unfettered discretion for counsel to introduce inadmissible evidence through expert testimony, this is not true. The following has been observed regarding the introduction of inadmissible evidence through an expert:

> The problem with permitting the expert an unfettered right to disclose to the jury otherwise inadmissible facts upon which he or she reasonably relied in forming an opinion, is that the jury might improperly use those facts as substantive evidence. Read together, Rules 703 and 705 reveal that the data underlying an expert's opinion . . . does not come in as substantive evidence. The data is admitted for the limited and independent purpose of enabling the jury to scrutinize the expert's reasoning. . . . The trial judge has discretion to limit the admission of such underlying inadmissible data under Rule 403 if it is unduly prejudicial, confusing, or misleading.

2 Palmer, Davis, & Cleckley, *Handbook on Evidence* § 705.02, at 154-55. In the seminal case by this Court addressing the issue of inadmissible underlying data, *Doe v. Wal-Mart Stores, Inc.*, 210 W. Va. 664, 558 S.E.2d 663 (2001), we noted that, "[u]nder Federal Rule 703, the trial court must undertake a balancing test to determine whether to allow an expert to testify to inadmissible facts that helped formed the basis of his or her opinion." *Doe*, 210

30

W. Va. at 676, 558 S.E.2d at 675. We went on to set out the following dispositive principle of law in *Doe*:

> An expert witness may testify about facts he/she reasonably relied upon to form his/her opinion even though such facts would otherwise be inadmissible as hearsay if the trial court determines that the probative value of allowing such testimony to aid the jury's evaluation of the expert's opinion substantially outweighs its prejudicial effect. If a trial court admits such testimony, the jury should be instructed that the otherwise inadmissible factual evidence is not being admitted to establish the truth thereof but solely for the limited purpose of informing the jury of the basis for the expert's opinion.

Syl. pt. 3, *id.*[27] *See also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."); *Payne v. Schneider Nat. Carriers, Inc.*, 737 F. Supp. 2d 969, 975 (S.D. Ill. 2010) ("Likewise, hearsay is not rendered admissible merely because it is included in Goebelbecker's expert report."); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. 2008) ("While the sources of an expert opinion need not be admissible in evidence, they must be reliable. . . . Acceptance of the notion that an expert can reasonably base his opinion on [any source] would effectively eliminate [the requirement] that an expert's opinion be grounded on reliable information."). The above principles make it clear that a trial judge has discretion to limit disclosure of inadmissible underlying data relied upon by an expert.

---

[27]The principle of law set out in Syllabus point 3 of *Doe* was incorporated into the 2014 amendment to West Virginia Rule of Evidence 703.

31

In the instant case, Mr. Lambert's brief sets out a general and vague argument suggesting the trial court improperly limited the testimony of Dr. Bernstein. According to Mr. Lambert, the trial court restricted Dr. Bernstein's "testimony to facts within his knowledge – facts and testimony that he personally received in the courtroom, and other admissible evidence." Other than make this generalization, Mr. Lambert has not cited to any specific limitations on Dr. Bernstein's testimony during the trial. The one example cited in the brief is a long quotation from a sidebar discussion at trial. In that discussion, the trial court merely points out that it may limit some evidence by Dr. Bernstein that was taken from Mr. Lambert's medical records.[28] The court did not say, as suggested by Mr. Lambert, that Dr. Bernstein could not testify to anything found in those medical records.[29]

In our review of Dr. Bernstein's testimony, we find that he was, in fact, permitted to introduce reliable data associated with the diminished capacity defense. Dr. Bernstein informed the jury that he diagnosed Mr. Lambert with chronic post-traumatic stress

---

[28]It will be noted that there were numerous sidebar discussions during the direct testimony of Dr. Bernstein regarding specific objections by the State. In none of those discussions did the trial court issue a blanket prohibition of testimony by Dr. Bernstein. Mr. Lambert has failed to assign error to any of the trial court's specific rulings on the State's objections.

[29]Mr. Lambert also cited to the decision in *State v. Duell*, 175 W. Va. 233, 332 S.E.2d 246 (1985), *superseded by rule as stated in State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995). In *Duell*, we reversed a first-degree murder conviction because the trial court improperly restricted testimony of the defendant's expert. *Duell* does not help Mr. Lambert because he has failed to point to any specific prejudicial limitation on Dr. Bernstein's testimony, *i.e.*, specific evidence or testimony that was excluded.

32

disorder ("PTSD") and impulsive aggressive behaviors, which were consistent with his prior military medical history. The jury was informed that Mr. Lambert "was treated by the VA system, probably the experts in this country on treating PTSD. He received medication and he received various forms of psychotherapy." Dr. Bernstein informed the jury that Mr. Lambert was being treated for PTSD on the day that he killed Ms. Maroney. According to Dr. Bernstein's testimony Mr. Lambert had a history of delusional thoughts. It was testified to by Dr. Bernstein that Mr. Lambert suffered from dissociative events and that he suffered from the same after he killed Ms. Maroney.[30] Dr. Berstein informed the jury that Mr. Lambert had a personality disorder, which was defined as "a chronically dysfunctional way of interacting with other people[.]" The jury was also told that Mr. Lambert was diagnosed with a depressive disorder. According to Dr. Bernstein "impulsive aggression in depressed men is a common finding but not so in depressed women." Ultimately Dr. Bernstein testified that as a result of the aforementioned mental diseases, Mr. Lambert was "incapable of formulating homicidal intent or premeditation[.]"[31]

---

[30]Dr. Bernstein described dissociative event as follows:

> Well, a dissociative event is an event where it can be anything from a so-called out-of-body experience to literally having no memory for an event even though you're participating in it and looking like you're fine.

[31]Mr. Lambert set out a convoluted argument in his brief that the trial court committed reversible error by finding "that Dr. Bernstein had performed a forensic evaluation." This extremely vague argument has no merit. In our review of the complete

(continued...)

33

In sum, our review of Dr. Bernstein's testimony revealed that he was not prevented from testifying about all of the essential aspects of Mr. Lambert's mental health in relation to the diminished capacity defense. To the extent that the trial court excluded specific testimony by Dr. Bernstein, Mr. Lambert has failed to set out the specific testimony that was excluded and the reasons why such exclusion was prejudicial. We therefore find no merit to this assignment of error.

### F. The State's Cross-Examination of Mr. Lambert's Expert

Mr. Lambert contends that the trial court committed error in allowing the State to cross-examine his expert, Dr. Bernstein, in certain areas. Specifically, Mr. Lambert argues that the State impermissibly cross-examined Dr. Bernstein about medical records and reports, statements made by Dr. Miller and Mr. Lambert, and Mr. Lambert's jail record.

We pointed out in Syllabus point 12 of *State v. McIntosh*, 207 W. Va. 561, 534 S.E.2d 757 (2000), that

---

[31](...continued)
discussion cited in the brief, wherein the trial court mentioned the phrase "forensic interview," it is clear that the trial court understood that Dr. Bernstein was testifying as an expert. Mr. Lambert argues on appeal that the trial court's use of the phrase "forensic interview set the stage for the remainder of the testimony by Dr. Bernstein." We have no clue as to what that means. Nowhere in this argument did Mr. Lambert ever explain how he was prejudiced by the trial judge's reference to "forensic interview." We summarily reject this dubious and inadequately briefed issue.

> [t]he extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in the case of manifest abuse or injustice. Syl. pt. 4, *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956). Syllabus, *State v. Wood*, 167 W. Va. 700, 280 S.E.2d 309 (1981).

In Syllabus point 4 of *State v. Richey*, 171 W. Va. 342, 298 S.E.2d 879 (1982), we outlined basic rules of cross-examination as follows:

> Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination.

The cross-examination issues raised by Mr. Lambert will be addressed separately.

### 1. Cross-examination of Dr. Bernstein about medical records and reports.

During the State's cross-examination of Dr. Bernstein, the following question was asked:

> Q. Referring to the Hudson Forensic Psychology Report at page 7, did the evaluator make the following statement: "Mr. Lambert may not have answered in a completely forthright manner during that evaluation?"

Mr. Lambert objected to the question on the grounds that it was not proper cross-examination because the court had prohibited Dr. Bernstein from testifying about the Hudson report on direct examination. The trial court overruled the objection.

35

The State contends that Dr. Bernstein did, in fact, testify about the Hudson report on direct examination. The direct testimony referred to by the State was as follows:

> Q. Moving along. Doctor, you mentioned psychiatric testing that you had ordered. What —
>
> A. Psychological testing, right.
>
> . . . .
>
> Q. Go ahead.
>
> A. Thank you. The psychological testing did show — hold on just a second — amongst other things, quote: "His responses suggest that he is an individual who is easily angered, has difficulty controlling the expression of his anger, and is perceived by others as having a hostile, angry temperament. When he loses control of his anger, he is likely to respond with more extreme displays of anger, including damage to property and threats to assault others. However, some of these displays may be sudden and unexpected, as he may not display his anger readily when it is experienced."

We are not able to verify that the passage quoted in Dr. Bernstein's testimony was in fact contained in the Hudson report because that report was not made part of the record. However, Mr. Lambert has not challenged the accuracy of the State's representation that the source of the quote was the Hudson report. Consequently, we find the State properly questioned Dr. Bernstein about the report.[32]

_____

[32]Even if this Court found that Dr. Bernstein did not mention the Hudson report on direct examination, we would still find that the cross-examination by the State was proper

(continued...)

**2. Cross-examining Dr. Bernstein about statements made by Dr. Miller and Mr. Lambert.** The next argument is that it was improper for the State to ask Dr. Bernstein whether he heard certain trial testimony by Mr. Lambert[33] and whether he agreed with statements made by Mr. Lambert and Dr. Miller during their interview.

The State responds first that Mr. Lambert did not make any objections to questions asked of Dr. Bernstein regarding statements made between Mr. Lambert and Dr. Miller. Our case law is clear in holding that it is "the general rule that a party's failure to object waives any right to appeal an issue." *Honaker v. Mahon*, 210 W. Va. 53, 60, 552 S.E.2d 788, 795 (2001). *See also State v. Flanders*, 218 W. Va. 208, 214, 624 S.E.2d 555, 561 (2005) ("Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." (internal quotations and citation omitted)). Our review of the record supports the State's argument, therefore we find this issue has been waived.

---

[32](...continued)
for impeachment purposes. We have made clear that, "[w]hile the scope of cross-examination is . . . usually limited to matters brought out on direct, . . . cross-examination to impeach is not, in general, limited to matters brought out on direct examination." *State v. Scarbro*, 229 W. Va. 164, 170, 727 S.E.2d 840, 846 (2012) (internal quotations and citation omitted).

[33]It appears that Dr. Bernstein was not at the trial for all or part of Mr. Lambert's testimony.

37

In addition, the State contends that the issue of questioning Dr. Bernstein regarding statements Mr. Lambert made to him is not properly before this Court. The State asserts that the grounds for objection set out in Mr. Lambert's brief were not the grounds for objection argued below. In this appeal, Mr. Lambert argues that the cross-examination in this area was improper because Dr. Bernstein was not in court to hear his testimony, and because "defense counsel was limited to questioning him about statements and evidence he heard in the courtroom and about admissible evidence." The State takes the position that these grounds were not asserted below.

Under our rules of evidence and case law, parties are required to succinctly articulate their objections at the trial court level and are bound by the same on appeal:

> To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace. The forfeiture rule . . . fosters worthwhile systemic ends and courts will be the losers if we permit the rule to be easily evaded. It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.

*State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 216, 470 S.E.2d 162, 170 (1996) (citation omitted). We have stressed repeatedly that

> [t]rial courts should not have to guess the nature of claimed defects. Further, this Court should not have to examine

38

with a fine tooth comb the lines of trial transcripts to discern the true meaning of objections made at trial.

*State v. Ladd*, 210 W. Va. 413, 428-29, 557 S.E.2d 820, 835-36 (2001).[34]

In our review of the State's cross-examination in the area complained of, we find that only two objections were made to specific questions. In both objections Mr. Lambert simply stated that the questions were "nonrelevant." The grounds for objections at trial are clearly not the grounds assigned on appeal. Consequently, we find this issue is also waived. *See State v. Browning*, 199 W. Va. 417, 425, 485 S.E.2d 1, 9 (1997) ("The State responds that the defendant waived appellate review because she did not object at trial on the grounds she is raising on appeal. . . . [W]e agree with the State that the defendant waived appellate review of this issue.").

---

[34]At the time of the trial of this case, Rule 103(a)(1) of the West Virginia Rules of Evidence provided, in relevant part:

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, *stating the specific ground of objection*, if the specific ground was not apparent from the context. . . .

(Emphasis added). Subsequent to Mr. Lambert's trial Rule 103 was amended. The amendment has no effect on the issues in this case.

**3. Cross-examining Dr. Bernstein about Mr. Lambert's jail record**. Mr. Lambert argues next that the State improperly cross-examined Dr. Bernstein about his jail record. This assignment of error is merely five sentences that are not accompanied by any legal authority. Our cases have made clear that "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996). This Court has explained that "[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim[.] Judges are not like pigs, hunting for truffles buried in briefs." *State, Dept. of Health v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995). Our cases have held:

> An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment.

*State v. Myers*, 229 W. Va. 238, 241, 728 S.E.2d 122, 130 (2012) (internal quotations and citations omitted). As a result of Mr. Lambert's failure to adequately brief this issue, we will not consider the matter.[35]

---

[35]Because we found only one error in this case, regarding the jury instruction on lying-in-wait murder, we need not address Mr. Lambert's final assignment of error pertaining to the cumulative effect of numerous errors.

**IV.**

**CONCLUSION**

In view of the foregoing, the judgment of the circuit court of Raleigh County convicting Mr. Lambert of first-degree murder and sentencing him to life in prison without the possibility of parole is affirmed.

Affirmed.

41