**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180503-U

Order filed August 5, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0503 Circuit No. 17-CF-496 |
| DAVONTAE D. DYE, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justice Wright concurred in the judgment.
Justice Holdridge specially concurred.

**ORDER**

¶ 1      *Held*: (1) The circuit court did not err in denying defendant's motion for a directed verdict; (2) the court did not abuse its discretion in allowing the jury to review video evidence in the courtroom; and (3) the court did not err in admitting identification evidence, such that defendant is unable to show plain error or ineffective assistance of counsel.

¶ 2      Defendant, Davontae D. Dye, appeals following his conviction for first degree murder.

He argues that the Peoria County circuit court erred in denying his motion for a directed verdict.

He also argues that the court erred in allowing the jury to review video evidence in the

courtroom during its deliberations. Finally, defendant argues that certain identification testimony from two witnesses was inadmissible. He argues that the court committed plain error in admitting that evidence and defense counsel was ineffective for failing to object to the admission thereof. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4        The State charged defendant via indictment with first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)). The indictment alleged that defendant knowingly shot Darran Durrette with a handgun, causing his death.[1] Prior to trial, the State indicated that it was not proceeding on a theory of accountability.

¶ 5        The evidence at trial established that Durrette was shot five times outside of the Harrison Homes in Peoria on April 12, 2017, at approximately 6:45 p.m. A firearm was subsequently recovered near the base of a tree near apartment No. 174. Shell casings found at the scene, as well as bullets recovered from Durrette's body, were determined to have originated from the firearm that was found. A swab of the firearm revealed two or more DNA profiles, such that no match could be made to any individual.

¶ 6        Security cameras at the Harrison Homes were motion-activated and took one photograph every one to two seconds. A portion of the security video from the night in question was played in court. The video showed a man wearing dark colored clothing and white shoes running through a common area. Soon thereafter, a man wearing a red shirt can be seen running. The two men and a woman appear to briefly meet outside the entrance of a building, but the two men

---

[1]The State charged defendant with two other forms of first degree murder as well but proceeded to trial only on the single charge detailed here.

soon disperse back into the common area. The man in dark clothing is then seen running to a tree, kneeling down, and placing something on the ground.

¶ 7        Lakenya Brookins testified that she was living in apartment No. 173 on the night in question. She denied hearing gunshots that night and denied seeing a person run past her apartment. She denied that she spoke with the police that night.

¶ 8        Brookins admitted that she spoke with the police the next day and that the interview was recorded. She admitted that she told the police on that occasion that she saw a "light-skinned dude" throw a gun down, put leaves over it, and run away. At trial, however, she added that she "probably just said it because [she] was scared." Brookins testified that she did not recall a number of other statements she purportedly made during that interview. Brookins agreed that she was shown a photographic lineup and that she selected one person from that lineup. On cross-examination, Brookins testified that the person she chose in the lineup "probably wasn't" the person she saw on the night in question.

¶ 9        Portions of Brookins's interview, conducted by Peoria Police Sergeant Keith McDaniel, were played in open court. In the interview, Brookins tells McDaniel that she heard four gunshots. She subsequently saw a person pull a gun out, put it on the ground by a tree, and throw leaves over it. Brookins tells McDaniel that that person was wearing "all black." She did not have first-hand knowledge of the name of the person she saw. Though this portion of the video was not played in court, McDaniel would later testify that Brookins stated during the interview that a man named Jujuan Faulkner ran into her apartment after the shooting.

¶ 10        Trestan Wallace testified that on the night in question he was in a field next to the parking lot of the Harrison Homes. He heard gunshots and saw a number of people running, but denied ever seeing anyone with a gun. Wallace could not recall anyone placing a gun by a tree.

3

Wallace did recall speaking to the police the next day. He did not remember telling the police that he saw a "guy getting shot." Wallace denied memory of numerous other portions of his conversation with the police.

¶ 11        Wallace did remember being shown a photographic lineup. He circled the photograph of defendant in the lineup but did not recall writing anything next to the photograph. On cross-examination, Wallace stated that he picked defendant out of the lineup because: "the cops *** they kind of told me what they wanted me to do."

¶ 12        Portions of Wallace's interview were also played in open court. In the interview, Wallace tells McDaniel that he saw "a young dude" multiple times over the course of the day in question. He also saw a "white dude" talking to people at the Harrison Homes, including the young dude. Later, Wallace saw the young dude walking through the parking lot with "an aggressive look on his face." Wallace describes the young dude as "holstering real hard," making a motion of grabbing at his waistband as he said it. Wallace then saw a police truck enter the area. Wallace continues: "As the police truck come in, he kind of *** puts something on top of the car tires, in between cars. So right then I knew he had something on him."

¶ 13        Wallace next saw the young dude, still angry, go around the corner of a building. He tells McDaniel that the young dude had not been around the corner for even a full minute before he heard gunshots. He then saw the young dude "take off running back around the corner." Wallace saw him "throw [the gun] on the side of the tree," take off his hooded sweatshirt, and continue running. Later in the interview, Wallace confirms that the person he saw hide a gun when police drove through was the same person he saw running and throwing a gun down by a tree.

¶ 14        McDaniel then asks Wallace if he knows anything about the person he saw. Wallace responds: "They call him Tay. I know his name Devontae, a light-skinned guy."

4

¶ 15      Candice Fillpot of the Peoria Police Department testified that she showed the photographic lineups to both Brookins and Wallace. Her administration of the lineups was recorded on video. Each video was played in open court.

¶ 16      The video depicting Brookins shows Fillpot explaining the lineup procedure in Brookins's apartment. After being shown the lineup card, Brookins selects the fourth photograph approximately 25 seconds later. Fillpot then asks Brookins to write something short on the photograph explaining how she recognized the person. After Brookins writes under the photograph, Fillpot confirms: "You wrote: 'Throw gun under tree and covered with leaves.' " Brookins agrees.

¶ 17      Fillpot then testified regarding People's exhibit No. 23, the photographic lineup card shown to Brookins. Next to the photograph that Brookins selected, she wrote "Threw gun under tree, covered with leaves." People's exhibit No. 23 was admitted into evidence and published to the jury without objection.

¶ 18      The video depicting Wallace shows Fillpot entering the interrogation room and explaining the lineup procedure to Wallace. When Fillpot hands Wallace the lineup, Wallace selects the third photograph within five seconds. Fillpot explains to Wallace that she does not know anything about the offense under investigation, then asks Wallace to write something short next to the photograph explaining his identification. Wallace tells Fillpot: "I seen him drop the gun."

¶ 19      Fillpot then testified regarding People's exhibit No. 26, the photographic lineup card shown to Wallace. Next to the photograph that he selected, Wallace wrote "Who I seen hide gun." People's exhibit No. 26 was admitted into evidence and published to the jury without objection.

5

¶ 20    Brookins and Wallace selected the same photograph from the lineups. McDaniel testified that the photograph was of defendant.

¶ 21    At the close of the State's evidence, defendant moved for a directed verdict. The court denied the motion.

¶ 22    During deliberations, the jury sent a note to the court, asking to review the security footage from the Harrison Homes. The court discussed the request with the parties, noting that the jury had been shown only six minutes of a much longer video. Defense counsel suggested the jury "be brought back in the court and just have it shown to them, that six-minute portion that was introduced." The court responded: "Bringing a jury into the courtroom during a jury deliberation is always dangerous, not saying it can't be done." The State suggested the jury view the video in the courtroom, without any discussion.

¶ 23    The court closed the courtroom to the public, then invited the jury in to view the security footage one additional time. Two bailiffs, a sheriff's deputy, defendant, defense counsel, two prosecutors, the court reporters, the clerk, and the judge were present in the courtroom with the jury. The court informed the jury that it would be watching the video one additional time; nothing more was said while the jury was in the courtroom.

¶ 24    The jury found defendant guilty. The court sentenced him to 60 years' imprisonment.

¶ 25                                    II. ANALYSIS

¶ 26    Defendant raises three arguments on appeal. First, he argues that the court erred in denying his motion for a directed verdict. Second, defendant argues that the court committed reversible error by replaying video evidence in the courtroom. Third, he contends that the State "improperly emphasized" evidence of Brookins's and Wallace's prior identifications of defendant.

6

¶ 27                          A. Motion for Directed Verdict

¶ 28         Defendant argues that his motion for directed verdict should have been granted because "there was not sufficient evidence that defendant was the person who shot Durrette," and the State was not proceeding under an accountability theory. He points out that certain evidence, such as the security footage, Brookins's statement to McDaniel, Wallace's interview, and forensic testing, indicated that more than one person was involved in the shooting.

¶ 29         A motion for a directed verdict asserts that, as a matter of law, the evidence presented by the State is insufficient to support a verdict of guilty. *People v. Withers*, 87 Ill. 2d 224, 230 (1981). Such a motion "requires the trial court to consider only whether a reasonable mind could fairly conclude the guilt of the accused beyond reasonable doubt, considering the evidence most strongly in the People's favor." *Id.* "In moving for a directed verdict, the defendant admits the truth of the facts stated in the State's evidence for purposes of the motion." *People v. Connolly*, 322 Ill. App. 3d 905, 915 (2001). A challenge to the circuit court's denial of a motion for a directed verdict presents a question of law, which we review *de novo*. *Id.* at 917-18.

¶ 30         Both Brookins and Wallace identified defendant as the person who hid a gun under a tree shortly after gunshots were fired. Moreover, Wallace told McDaniel that the person who he saw hide the gun after the gunshots was the same person who he saw holding the gun—and attempting to shield it from police—before the shooting. As defendant admits to the truth of this evidence for the purposes of a motion for directed verdict, and we consider the evidence strongly in the State's favor, it is clear that a reasonable mind could conclude that defendant was the person who fired the gun. Accordingly, the court properly denied defendant's motion for a directed verdict.

¶ 31                          B. Viewing of Evidence

7

¶ 32    Defendant next argues that the court's decision to allow the jury to review the security footage in the courtroom, in the presence of several individuals, was an abuse of discretion. In making his argument, defendant relies on a line of cases finding that the review of evidence in the presence of nonjury members has a chilling effect on deliberations. *E.g.*, *People v. Hollahan*, 2019 IL App (3d) 150556, ¶ 20.

¶ 33    Recently, however, our supreme court explicitly rejected the notion that the type of procedure employed by the court here amounts to error. See *People v. Hollahan*, 2020 IL 125091, ¶¶ 23-25. The court credited the State's assertion that it is " 'universally accepted' that a trial court may allow the jury, during deliberations, to return to open court to review a tape recording admitted in evidence." *Id.* ¶ 22 (quoting *State v. Hughes*, 691 S.E.2d 813, 826 (W. Va. 2010). The *Hollahan* court found that the rationale related to the chilling of deliberations was not viable because the circuit court plainly has the authority to temporarily suspend deliberations, such that deliberations were not presently occurring when the jury was reviewing evidence in the court room. *Id.* ¶ 25. The court concluded:

> "The [circuit] court also advised the jury that it had 'instructed everyone to not say a word.' There is no suggestion of record that anyone *did* say a word—not the court, not the attorneys, and not the jurors. More to the point, there is no suggestion that the jurors communicated amongst themselves while in the courtroom. In short, deliberations did not take place while the jury was reviewing the video." (Emphasis in original.) *Id.*

¶ 34    We note that *Hollahan* had not been decided by our supreme court at the time defendant filed his initial brief. However, after the State raised that new decision in its response, defendant made no argument in his reply that *Hollahan* should not or does not apply to this case.

8

Accordingly, we find that *Hollahan* controls the outcome here, and we reject defendant's contention that the circuit court abused its discretion in allowing the jury to review evidence in the courtroom.

¶ 35                                    C. Identification Evidence

¶ 36        Finally, defendant argues that "[t]he State improperly emphasized *** Brookins's and *** Wallace's prior identifications of defendant by reiterating evidence of the identifications, including publishing handwritten statements on photo arrays." Defendant also claims that Fillpot's testimony as to what Brookins and Wallace wrote on their lineup cards, McDaniel's testimony that Wallace identified defendant, and the video of Brookins's photo array were each unnecessary and therefore inadmissible. He argues that the admission of that emphasizing evidence was plain error, or, alternatively, defense counsel's failure to object to the admission of that evidence amounted to ineffective assistance.

¶ 37        Initially, we note that whether reviewing for plain error or for ineffective assistance of counsel, the first step in the analysis will be the same. In plain error review, the first step is to determine whether clear or obvious error occurred. *E.g.*, *People v. Henderson*, 2017 IL App (3d) 150550, ¶ 37. In an ineffective assistance of counsel analysis, in order to demonstrate any sort of prejudice flowing from counsel's failure to object to the admission of evidence, defendant must first show that any such objection would have been sustained. *E.g.*, *People v. Bean*, 137 Ill. 2d 65, 132-33 (1990). Thus, the operative inquiry under either course is whether the evidence to which defendant presently objects was admissible.

¶ 38        Section 115-12 of the Code of Criminal Procedure of 1963 holds that "[a] statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the

9

statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2018). Defendant concedes that section 115-12, generally, rendered the evidence of Brookins's and Wallace's identifications of defendant substantively admissible. However, he argues that the evidence presented by the State regarding those identifications went beyond what was strictly necessary.

¶ 39    Defendant's argument is based entirely on the First District decision of *People v. Anderson*, 2018 IL App (1st) 150931. In that case, Marquell Carter testified that he saw the defendant carrying a gun in his waistband. *Id.* ¶ 8. Carter also testified that, three days later, he went to the police department and identified the defendant in a photographic lineup, and that he wrote on the lineup card that he saw a gun in the defendant's waistband. *Id.* ¶ 9. The State published the lineup card and asked Carter to reiterate his identification. *Id.*

¶ 40    The *Anderson* court held that "when admitting a prior identification as substantive evidence under section 115-12, the testimony may include a description of the offense 'only to the extent necessary to make the identification understandable to the jury,' but it may not go beyond that to provide 'detailed accounts of the actual crime.' " *Id.* ¶ 42 (quoting *Brown v. United States*, 840 A.2d 82, 89 (D.C. 2004)). Under that standard, the court found that Carter's testimony regarding his prior identification of the defendant was properly admitted. *Id.* ¶ 43.

¶ 41    The court went on to consider whether the additional steps of publishing the lineup card and having Carter reiterate his testimony was improper. In concluding that they were improper, the court stated:

> "In doing so, the State unnecessarily and improperly emphasized Carter's written out-of-court statements in the eyes of the jury. As this court has previously observed, [p]eople tend to believe that which is repeated most often, regardless of

10

its intrinsic merit." (Internal quotation marks omitted.) *Id.* ¶ 48. (quoting *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60, quoting *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985)).

¶ 42     The facts in *Anderson* diverge from those in the instant case in one significant respect. In *Anderson*, Carter testified that he saw the defendant with a gun, then affirmatively testified that he identified the defendant to the police. Accordingly, the overriding concern throughout the *Anderson* opinion is the use of prior consistent statements to bolster the credibility of a State's witness. *E.g.*, *id.* ¶¶ 21, 37, 48. In finding error, the court made clear that its holding was based upon the inadmissibility of prior consistent statements. *Id.* ¶ 48 (finding that Carter's written statements were improperly used to bolster his testimony). In fact, the court's lone citation in its operative paragraph was to *Johnson*, 2012 IL App (1st) 091730, a case concerning prior consistent statements.

¶ 43     The *Anderson* court did not find the introduction and publication of the lineup cards or Carter's reiteration testimony inadmissible because that evidence constituted additional "detailed accounts of the actual crime." Indeed, with respect to the scope of section 115-12, the *Anderson* court was concerned with the *kind*, rather than the *amount* of evidence. It only found improper emphasis and reiteration where prior consistent statements were involved and bolstering was of concern. We construe *Anderson* to stand for the proposition that even where prior consistent statements would be otherwise admissible under section 115-12, their admission should be limited to only what is necessary.

¶ 44     In this case, both Brookins and Wallace denied having any knowledge of the shooting. Brookins testified that she identified a person from a lineup but did not say who. She also recanted that identification in her testimony. Wallace admitted that he selected defendant but

11

testified that he only did so to appease the police. Neither witness testified as to a specific connection between their identification and the offense. Defendant thus raises no prior consistent statement concerns in this appeal.

¶ 45    The State in this case was not attempting to improperly bolster Brookins's and Wallace's testimony with prior consistent statements. Rather, it was attempting to establish in the first place that Brookins and Wallace had identified defendant as the person that hid the gun under a tree. The videos of each witness examining the lineup card were relevant in establishing that there was no undue influence applied at the time, as well as the speed and relative certainty with which each witness selected defendant's photograph. Testimony from McDaniel was necessary in establishing that both Brookins and Wallace selected defendant from the lineup card. Fillpot testified as to the writing Brookins and Wallace made next to the photograph of defendant.

¶ 46    To be sure, the short writing next to the selected photograph on both Brookins's and Wallace's lineup card was delivered three times: once in the video, once through Fillpot's testimony, and once through the lineup cards themselves. However, these notes were, by their very nature, extremely brief accounts linking the identification to the offense. The evidence did not approach additional "detailed accounts of the actual crime," such that it would be, in the opinion of the *Anderson* court, outside the bounds of section 115-12. Further, defendant does not cite any authority for the proposition that the mere publication of admissible evidence amounts to reversible error.

¶ 47    Accordingly, we find no error in the admission of the evidence in question. It follows that there is no plain error and that counsel was not ineffective for failing to object to the admission of that evidence.

¶ 48                                    III. CONCLUSION

12

¶ 49    The judgment of the circuit court of Peoria County is affirmed.

¶ 50    Affirmed.

¶ 51    JUSTICE HOLDRIDGE, specially concurring:

¶ 52    I agree with the majority in this case but solely write separately as it relates to the viewing of evidence in subsection B (*supra* ¶¶ 31-34). As the authoring justice of *People v. Hollahan*, 2019 IL App (3d) 150556, I recognize that the supreme court has since held that it is acceptable for the court to suspend jury deliberations and allow the jury to review video or audio evidence in the courtroom with non-jurors present (*Hollahan*, 2020 IL 125091, ¶¶ 24-27). Nonetheless, I maintain that the best practice in such situation remains that which I outlined in *Hollahan*, 2019 IL App (3d) 150556, ¶¶ 20-23, 28. The jury should have the opportunity to review the video or audio evidence in the jury room alone. *Id.* ¶ 27. In cases where a video or audio recording must be played for a deliberating jury in the courtroom, the jury should view the video or listen to the audio in private, not in the presence of the parties, their attorneys, the trial judge, or court staff. *Id.* ¶ 28. Thus, while it was proper for the court to permit the jury to watch the security footage in the courtroom, best practice prescribes allowing the jury to watch such a video recording outside the presence of anyone else.